## THE SULIOTE.[1]

### (District Court, S. D. New York. May 8, 1885.)

**1. MARITIME LIEN—SHIP'S CREDIT—CASE STATED.**

The ship S., belonging to American owners, arrived with cargo at Greenock, Scotland. She was a stranger there, and the captain designated C. N. & Co. as her collecting and disbursing agents, who collected the inward freights and held a large balance for the ship. It appearing that she was in need of remetaling, C. N. & Co. ordered the necessary metal of the libelants, it being understood that the bill should be "paid by C. N. & Co. when the ship's accounts were adjusted," in cash, "under discount." Thereafter the ship remained in the vicinity for four months; but no demand for payment was ever made of the captain, and no inquiries were made of him about any of their dealings. The bill, audited by the captain, was rendered to C. N. & Co. The latter, on settling their accounts with the captain, included the bill as paid by them. After the ship had finally sailed, demands were made of C. N. & Co., but before payment they failed: and about a year after furnishing the supplies inquiries were first made after the owners. This action was thereafter brought to enforce an alleged lien upon the ship for the supplies, and, by consent, the liability of ship and owners was submitted. The judge found that the goods were not ordered or furnished on any intended credit of the ship. *Held*, that under the well-settled rule that no lien arises for a vessel's supplies except in case of necessity for the credit of the ship to obtain them, as large funds of the S. in the hands of C. N. & Co. were shown to have existed, which was known to the libelants, or would have become known to them on reasonable inquiry, there was no necessity for credit, and that no lien attached.

**2. SAME—OWNER'S LIABILITY—PRINCIPAL AND AGENT—INQUIRY FOR RESPONSIBLE PARTY—FOREIGN PRINCIPAL.**

The libelants contended that the ship's owners were liable *in personam* for the supplies. It was shown that the libelants did not know who the owners

1 Reported by R. D. & Edward G. Benedict, Esqs., of the New York bar.

were when the supplies were furnished; that they made no inquiry in regard to them until after the failure of C. N. & Co.; and that they evidently relied on the latter firm for payment. *Held,* that by the English law the credit of a foreign principal is not presumptively pledged by the dealings of an agent resident in the kingdom; that the maritime law also affords no *prima facie* presumption of authority in mere ship-brokers having funds of the ship, to bind her owners for supplies ordered by them, and there was no proof of any actual authority, that as C. N. & Co. were only agents in a limited capacity, did not know or have correspondence with the owners, and had in their hands sufficient funds of the ship, their ordering of supplies for the ship did not bind the owners by implication, and that the circumstances negatived any such authority; that the libelants were bound to make inquiries of the master of the ship, or take the risk of the actual authority of C. N. & Co. Not having done so, they could not now hold the owners responsible; and the libel was dismissed.

In Admiralty.

*Wingate & Cullen,* for libelants.

*Owen & Gray,* for the Suliote.

BROWN, J. This libel *in rem* was filed to recover the sum of £283 ($1,380) for supplies, consisting of white metal furnished in September, 1881, to the ship Suliote at Greenock, Scotland. The only question litigated is the liability of the vessel or of her owners upon the facts of the case; the parties having desired that the whole question, as respects the liability of either, should be considered and determined without reference to the form of the action.

The ship belonged to American owners. She was a stranger in Greenock, and the libelant had no knowledge of her master or owners. She arrived at that port with a cargo in August, 1881; and the master designated Clerk, Nuel & Co., of Greenock, as her collecting and disbursing agents there. They were an established firm of ship-brokers in that place, of good repute, and in good credit; and they were well known to the libelants. They collected the inward freights of the ship, amounting to about $17,500. The vessel being in need of remetaling, Clerk, Nuel & Co., through Mr. Nuel, since deceased, ordered the necessary white metal of the libelants. They furnished it, accordingly, prior to September 13, and the old metal was returned to them and credited on account. The libelants' witnesses say that Mr. Nuel told them that he was acting as agent of the ship and had authority to make inquires about prices; and that it was understood that the sale was made to the captain and owners; and that they gave no credit to Clerk, Nuel & Co. But it was "understood that payment would be made through Clerk, Nuel & Co. in cash, under discount, Mr. Nuel never having said anything about the ship's taking credit." No dealings were had with the captain in making the contract, nor were any inquiries made of him as to the terms of Clerk, Nuel & Co.'s authority. Both Mr. Nuel and the captain are dead. Their testimony was not procured; and there is no proof of the actual authority of Clerk, Nuel & Co., except such as is to be inferred from the circumstances of the case. It was understood at first that the bill should be paid by Clerk, Nuel & Co., "when the ship's accounts were adjusted, in cash, under discount;" that there should be a discount

of $2\frac{1}{2}$ per cent., and 1 per cent. additional if payment was made in cash, which, as I understand, might be at any time not exceeding one or two months after the sailing of the ship. This was the custom of the trade at Greenock. The bark did not sail until the seventeenth of November. On the twenty-first of September, about a week after the metal had been furnished and the bill, audited by the captain, had been rendered by the libelants to Clerk, Nuel & Co., the latter rendered to the captain of the ship their account of the debits and credits of the ship, in which the libelants' bill was included as paid; and a receipted voucher, signed by Clerk, Nuel & Co. for this bill as well as for other bills, was also returned to the captain. The account also showed a credit amounting to £2,000, which Clerk, Nuel & Co. had deposited with Baring Bros. & Co. to the credit of the ship on the tenth of September, the same week in which the libelants' supplies were furnished; and a final balance of £269, 8s., besides the amount needed to pay for the libelants' bill, was thereupon receipted for to the captain, and was paid by Clerk, Nuel & Co. upon various subsequent drafts by the captain to answer the ship's needs.

Shortly after sailing the ship met bad weather and was compelled to put back to Lamlash, 40 miles from Greenock. Her arrival was reported in the Greenock papers; and a mutiny of her crew, which led to judicial proceedings in Greenock, was also extensively commented upon. The captain finally sailed again from Lamlash on the ninth of January. During all this time the libelants had never consulted the captain in reference to the goods furnished by them, or the payment of their bill, and had never made any demand upon him. After the seventeenth of January, at some time not stated, and which does not definitely appear, requests for payment were made by the libelants of Clerk, Nuel & Co., to whom their bill had been rendered, as already stated, about the middle of September. As above observed, it "had been at first understood that they would settle the bill when the ship's accounts were adjusted." But after the ship had sailed for good they began to prevaricate, to speak of insufficient funds; and on various pretexts they put off payment, stating that they had not sufficient money, and that the owners would remit. In November following the firm failed and dissolved, and then, or shortly before, for the first time, the libelants instituted inquiries to ascertain who and where the owners were. On learning that they were in New York, the libelants forwarded to them a demand for the payment of their bill. Payment being declined, the present libel was filed on the fifth of December, 1883.

The evidence on behalf of the libelants shows that the charge upon their books was made against the "Bq. Suliote, and owners;" that it was usual at Greenock to furnish supplies on the order of ship-brokers, in the manner above stated, to be paid for, either in cash or at some time subsequent to the sailing of the vessel; but that it was "not usual in the case of a sale of goods to a foreign vessel, not known,

to permit her to depart without payment, except on the responsibility of reputable agents there;" and that in this case they did not know who or where the owners were, or anything as regards their responsibility, until their inquiries, after the failure of Clerk, Nuel & Co.

Upon the above facts I must hold that neither the vessel nor her owners are responsible for this bill.

1. It is well settled, under both the English and American law, that no maritime lien arises for supplies except in case of necessity, or apparent necessity, for the credit of the ship to obtain them. In the case of *Thomas* v. *Osborn*, 19 How. 22, 31, CURTIS, J., states the law on this point as follows:

"To constitute a case of apparent necessity, not only must the repairs and supplies be needful, but it must be apparently necessary for the master to have a credit to procure them. If the master has funds of his own which he ought to apply to purchase the supplies, which he is bound, by the contract of hiring, to furnish himself, and if he has funds of the owners which he ought to apply to pay for the repairs, then no case of actual necessity to have a credit exists; and if the lender knows these facts, or has the means by the use of due diligence to ascertain them, then no case of apparent necessity exists to have a credit; and the act of the master in procuring a credit does not bind the interest of the general owners in the vessel." *The Lulu*, 10 Wall. 192; *Stephenson* v. *The Francis*, 21 FED. REP. 715, 720.

The proofs show clearly that there was an abundance of funds available at Greenock, in the inward freights of the Suliote, to pay for all her repairs there, with a large surplus besides. There is no reason to suppose that there was any concealment of this fact from the libelants when the supplies were ordered. There was then no possible motive for concealment; the facts were easily ascertainable; and if the libelants did not know them, as they now testify, although I think they must have known them at the time, it was clearly their own fault in making no proper inquiry. They do not say whether they made any inquiries on this subject of Clerk, Nuel & Co. even; but do say that it was not understood "that the ship was to take credit." Material-men in a foreign port are bound to make inquiries of the *master* as to her need of credit, before seeking to charge the ship or her owners. Had any inquiry been made of the *master* with regard to the payment for these supplies, it is not to be supposed that the libelants would not have been fully informed of the ample funds which the inward freights afforded to pay for them; and that they could not, therefore, lawfully charge the ship. The master, moreover, was the only person that had any authority to bind the ship at all. In dealing with Clerk, Nuel & Co., instead of the master, the libelants must be held legally chargeable with such knowledge as a dealing with the master, and upon ordinary business inquiries of him, would have conveyed to them. The case is clearly, therefore, one in which neither the master, nor any one else at Greenock, had authority to bind the ship for supplies; because there were abundant means to pay for such supplies, and the libelants had means, by the use of ordinary dili-

gence, of ascertaining that fact. *The Lulu, supra; Insurance Co.* v. *Baring,* 20 Wall. 163; *The Eledona,* 2 Ben. 31, 37; *The J. F. Spencer,* 5 Ben. 151, 153; *Thacker* v. *Moates,* 1 Moody & R. 79; Abb. Shipp. \*135.

2. Whether the respondents are liable *in personam* depends upon the law of principal and agent. For goods ordered by Clerk, Nuel & Co., the respondents cannot be held unless Clerk, Nuel & Co. had authority to charge them personally therefor; nor unless such was the intent of the transaction. In both respects I think the libelants fail to make out a satisfactory case. The libelants' contract was clearly made with Clerk, Nuel & Co.; and the latter had no more presumptive authority to pledge the personal liability of the owners than they had to bind the ship. The case is one in which the language of Dr. Lushington in the case of *The Druid,* 1 W. Rob. 391, 399, is specially applicable:

"The liability of the ship," he says, "and the responsibility of the owners in such cases are convertible terms; the ship is not liable, if the owners are not responsible; and *vice versa,* no responsibility can attach upon the owners, if the ship is exempt, and not liable to be proceeded against."

In the English law it is now well settled that resident agents, buying goods on account of foreign principals, in the absence of facts showing a contrary intention, pledge their own credit only; on the ground that, for the conveniences of trade, it is not to be supposed that any privity of contract with a foreign principal is intended in such transactions. In *Smyth* v. *Anderson,* 7 C. B. 33, Maule, J., says:

"It is well known, in ordinary cases, where a merchant resident abroad buys goods here through an agent, the seller contracts with the agent, *and there is no contract or privity between him and the foreign principal.* If that question had been specifically put to the jury, there can be no doubt as to what their decision would have been."

In the case of *Armstrong* v. *Stokes,* L. R. 7 Q. B. 598, 605, Blackburn, J., says:

"The great inconvenience that would result if there were privity of contract established between the foreign constituents of a commission merchant and the home suppliers of the goods has led to a course of business, in consequence of which it has been long settled that a foreign constituent does not give the commission merchant any authority to pledge his credit to those from whom the commissioner buys them by his order and on his account. It is true that this was originally (and in strictness, perhaps, still is) a question of fact; but the inconvenience of holding that privity of contract was established between a Liverpool merchant and the grower of every bale of cotton which is forwarded to him in consequence of his order given to a commission merchant at New Orleans, or between a New York merchant and the supplier of every bale of goods purchased in consequence of an order to a London commission merchant, is so obvious and so well known that we are justified in treating it as a matter of law, and saying that, *in the absence of evidence of an express authority to that effect, the commission agent cannot pledge his foreign constituents' credit.* Where the constituent is resident in England, the inconvenience is not so great, and we think that, *prima facie,* the authority is given, unless there is enough to show that it was not in fact given."

In the subsequent case of *Hutton* v. *Bulloch*, L. R. 8 Q. B. 331, 334, the same law was restated, and the decision on appeal was affirmed in the exchequer chamber, (L. R. 9 Q. B. 572,) where BRETT, J., says of the foreign merchant abroad dealing in England through an English correspondent, his agent here:

"In such cases it is now settled that it is not in ordinary course for the foreign merchant to *authorize* the English merchant to bind him to the English contract." Story, Ag. § 268; Whart. Ag. § 791. See, also, *The St. Joze Indiano,* 1 Wheat. 208.

These cases, doubtless, apply only to purchases made through established agents resident in foreign countries. They have no application to *masters* of vessels who purchase necessary supplies in foreign ports. But here the purchase was not by the *master.* The libelants had no dealings with the master, but only with established agents residing at Greenock, and in good credit there; and in that point of view, the above authorities would seem strictly applicable.

A different rule is applied as respects an undisclosed principal residing within the kingdom. In that case, payment to the agent by the principal, and great delay by the vendor, will not deprive the vendor of his remedy against the principal, if the latter has not been in any way misled by the acts of the seller himself. *Davison* v. *Donaldson,* 9 Q. B. Div. 623; *Irvine* v. *Watson* 5 Q. B. Div. 102, 414. The question of election between the liability of the agent or of the principal does not here arise. See *Curtis* v. *Williamson,* L. R. 10 Q. B. 57; *Tuthill* v. *Wilson,* 90 N. Y. 428.

I have not been referred to any case in the federal courts of this country, nor have I found any such, in which this question is considered; though one branch of the subject was referred to in *Oelricks* v. *Ford,* 23 How. 64. In a number of cases in the state courts the creditor has been regarded as having a concurrent remedy against the agent, and against the foreign principal, when discovered, unless an exclusive credit was given to the agent; and that it is for the jury to determine that question from all the circumstances of the case. But the rule has no application to residents of different states in this country. *Kirkpatrick* v. *Stainer,* 22 Wend. 244, 254; *Taintor* v. *Prendergast,* 3 Hill, 72, 73; *Barry* v. *Page,* 10 Gray, 398; *Bray* v. *Kettell,* 1 Allen, 80.

But, aside from this view, all the facts of the case seem to me to show, and, as I think, any jury would find, that it was not Clerk, Nuel & Co.'s intention to buy these goods on the owners' credit at the time when the goods were ordered, and that the libelants did not understand that the goods were sold upon any credit to be given to the captain or to the ship or to the owners; but that such credit as they chose to give, was given exclusively to Clerk, Nuel & Co., notwithstanding the qualifications that the libelants now seek to make in that respect. The facts and circumstances of the case, and the conduct of the libelants at the time, must be taken to outweigh their

statements, three years afterwards, as to the particular form of their dealings with Mr. Nuel, especially as he and the captain are dead, and their version of the matter cannot be obtained. Clerk, Nuel & Co. had ample funds of the ship, and there is not the slightest probability that the libelants were not fully informed of that fact. They had easy means of knowledge, and the evidence clearly shows that they expected payment from these funds. The bark was a stranger in Greenock. She was not expected to return. The owners were unknown, and were not inquired after. The bill was rendered to Clerk, Nuel & Co.; nothing was said about any credit of the ship; demand of payment was made of them, and of them only; payment was promised, and evidently expected, out of the ship's funds in their hands; and not an inquiry, even, was ever made of the master, during the four months that he was accessible in that vicinity, about the ship, her owners, or her destination. It is incredible that any credit was, under such circumstances, given to the captain, as the libelants now assert; and if the captain was not liable, the owners are not.

As a question of intention at the time, and upon the actual facts of this case, I should feel constrained to find, as I think a jury would find, for the reasons previously stated, that Clerk, Nuel & Co. neither had, nor pretended to have, any authority to bind the vessel or her owners; that they did not intend to bind either, but themselves only; and that the libelants, in not calling for immediate payment, gave credit to Clerk, Nuel & Co. exclusively. The latter were agents of the ship for a very limited purpose. They had but a very limited authority, namely, to collect the ship's freights and to pay over the proceeds to the captain or upon his order, or else to apply them to the payment of such bills as they themselves should order for the ship on the captain's request. They were not the general agents of the owners. They did not know the owners. They had no correspondence with them, nor any previous dealings with them. The funds to pay for whatever they might order for the ship were in their own hands. Manifestly, therefore, they had no right, nor color of right, to buy anything upon the credit of the owners or of the ship. That, clearly, was not intended. To do so would be a fraud. The captain did, indeed, desire them to procure these supplies; but for the very reason that they already had the money to pay for them. That is why the captain did not make the contract. The captain audited the bill; but only to show that the work had been done, and that the bill might go to Clerk, Nuel & Co. for payment. The libelants never made any demand upon the captain for payment, and manifestly they never intended to make any demand of him; and the owners could not be liable for the bill unless the captain was liable. It is not credible that the captain ever authorized, or intended to authorize, Clerk, Nuel & Co. to procure supplies on his own credit, or on the credit of the ship or of her owners, when he had already put an excess of funds in Clerk, Nuel & Co.'s hands to pay for them, and when,

under the circumstances, he himself had no lawful authority to pledge the credit of the ship or her owners. If I give a servant $10, and tell him to go and buy me a barrel of flour with it, the seller, knowing the facts, cannot bind me by charging me with the price of the flour and letting the servant keep the money. Such facts, known to the seller, would import a cash transaction only, and would conclusively negative any authority for a credit. If, instead of exacting payment, the seller chose to give a credit, the credit must be a credit to the servant only. Clerk, Nuel & Co. had no more authority to pledge the credit of the owners than the servant his master's in the case supposed.

The maritime law, moreover, affords no *prima facie* presumption of authority in ship brokers having funds to bind the ship, or her owners, for supplies ordered by them. They had no presumed author'ty beyond their actual authority. The libelants were bound at their peril to ascertain their authority through proper inquiries. Had such inquiries been made, they would have learned all the facts; and I have little doubt that all the facts were sufficiently known to the agent of the libelants that transacted this business. It is only the *master*, or ship's husband, or managing part owner, or the general agents of the owners, as in the cases of *The Patapsco*, 13 Wall. 329, and *The Ludgate Hill*, 21 FED. REP. 431, that have any general authority implied by the maritime law to bind the ship or her owners. The libelants, in dealing with Clerk, Nuel & Co., instead of with the captain, whom they never saw and of whom they made no inquiries, were therefore bound to ascertain the authority of Clerk, Nuel & Co., if they undertook to charge the ship or her owners. There were no acts, either of the captain or of the owners, that gave Clerk, Nuel & Co. any apparent authority to bind the ship or the owners, and thus operated as an equitable estoppel. There was no difficulty in making proper inquiries of the captain. When the libelants wanted their bill audited by him, in order to get payment from Clerk, Nuel & Co., they had no difficulty in getting the captain's signature. The libelants, therefore, were bound to make proper inquiries of the master, or take the risk of the actual authority of Clerk, Nuel & Co.; and this authority manifestly, as it seems to me, did not extend to bind the ship or her owners for supplies when they had in their hands the money to pay for them. I do not credit the suggestion that Clerk, Nuel & Co. intended to bind them, or that they gave any ground for such a supposition until after the bark had sailed. The libelants' testimony, carefully scrutinized, does not say that Mr. Nuel at first suggested any credit to the ship or to her owners, or any liability of either, but rather the contrary. In effect all that the libelants testify to is that they "understood the sale to be made to the captain and owners," and "solely on their credit." They do not say that Mr. Nuel pretended to have any authority to pledge the credit of the ship or of the captain or of her owners, or that he undertook to pledge their credit for these supplies. But what-

ever Mr. Nuel may have said, his assertions could not bind the absent owners. The fact that the ship had sufficient funds being known, or easily ascertainable, even the captain could not have charged the owners personally for the supplies; much less could Clerk, Nuel & Co. do so.

The bill presented to the captain to be audited was, indeed, headed, though in a way little likely to attract his attention, "Bq. Suliote and owners." But this was not until after all the goods had been supplied. The libelants, in furnishing the goods, were in no way influenced by the captain's signature; and, as I have said, it was but an audit by the captain indicating the delivery of the articles, so as to entitle the libelants to payment from Clerk, Nuel and Co. Two of the libelants' witnesses testify that "the purpose of obtaining the master's approval of the bill was to satisfy Clerk, Nuel & Co. that it was correct, *so that they would pay the bill as rendered.*" After the death of the captain and of Mr. Nuel, and the inability to obtain their testimony, no conclusive weight can be fairly attached to such a circumstance, against the other strong implications of the case. Nor can much weight, under the circumstances of this case, be given to the form of the charge on the libelants' own books. That form would be naturally used as a means only of identifying the bill. *Beinecke* v. *The Secret,* 3 FED. REP. 667; *Stephenson* v. *The Francis,* 21 FED. REP. 722.

Notwithstanding the able and elaborate brief of the libelants' counsel, I feel constrained, therefore, to dismiss the libel, but without costs.