## THE CHICKLADE.

### (District Court, E. D. Virginia. January 26, 1903.)

1. MARITIME LIENS—SERVICES OF STEVEDORE TO FOREIGN SHIP—CONTRACT MADE BY CHARTERER.

Libelant contracted with a firm of ship brokers to load a foreign ship. During the progress of the work he ascertained that the ship was under

¶ 1. Maritime liens for supplies and services, see note to The George Dumois, 15 C. C. A. 679.

charter to a firm composed of the same persons as the brokerage firm, but made no inquiry as to the terms of the charter party, nor did he notify the master of any claim against the ship, which sailed without knowledge of any such claim. Libelant presented his claim to the brokerage firm and received a check therefor, which was not paid because the firm became insolvent. By the terms of the charter, the charterers were required to pay for all stevedoring. *Held*, that libelant was not entitled to a lien upon the ship for his services.

**2. SAME—STEVEDORES—DUTIES OF.**

No lien exists against a foreign ship for stevedores services in loading a ship, unless the contract is made with the ship's master, or the latter is advised of the purpose to hold the ship liable at the time the service is performed. The burden of ascertaining the authority of the person at whose instance the stevedore acts, other than the master, should be imposed upon the stevedore.

In Admiralty. Suit in rem to enforce lien for stevedore's charges.

R. H. Riddleberger, for petitioner.
Hughes & Little, for respondent.

WADDILL, District Judge. This is a petition filed in the above-entitled cause by one Alexander Rowland, seeking to recover the sum of $1,547.58, alleged to be due him, as stevedore, for loading the British steamship Chicklade, at the port of Sabine, Tex.

The question presented is whether, under the facts of this case, the petitioner is entitled to a lien for the services performed by him. Under the law as now settled, a stevedore employed by the master of a vessel, or other person having authority to speak for the owners, and upon the ship's credit, has a lien upon the ship for such work. Such services are maritime in character, stevedores now performing the work formerly done by seamen, and their claims are so recognized and enforced by courts of admiralty. The George T. Kemp, Fed. Cas. No. 5,341; The Canada (D. C.) 7 Fed. 119; The Scotia (D. C.) 35 Fed. 916; The Wyoming (C. C.) 36 Fed. 535; The Mattie May (D. C.) 45 Fed. 899; The Seguranca (D. C.) 58 Fed. 908; Hughes, Adm. 113–115. The question in this case is one of fact rather than of law; that is, whether the petitioner rendered his service upon the credit of the ship, and by reason of an agreement with her master, or any one lawfully authorized to contract for the owners. The ship was under charter, dated October 13, 1900, to the Sabine Export Company, for a voyage from the Gulf ports to Europe; one of the conditions being that the charterers were to pay all port charges, including stowage and stevedoring. The petitioner was a resident of Sabine, Tex., and for some time prior to November 19, 1900, had been engaged in the business of a stevedore at that point; prior to which time he, together with R. A. McReynolds and George W. Huggins, had been engaged in the ship and ship brokerage business, under the several names of Sabine Export Company, the Sabine Transport Company, and R. A. McReynolds & Co.; but in January, 1900, the petitioner entered into an agreement with his partners whereby he withdrew from the several companies named, in consideration of their giving him the stevedoring of their vessels at certain rates agreed upon. The said R. A. McReynolds & Co. acted as ship brokers in the chartering of the Chicklade, one C. E. Solely being their representative in Great Britain, and the said firm was composed

of the same persons as the Sabine Export Company, charterers of the ship. The ship arrived at Sabine on the 12th of November, 1900, but prior thereto the petitioner, having been advised of her coming, notified R. A. McReynolds, the president of the Sabine Export Company, the charterers, that he claimed the right to load the ship under the agreement of January, 1900, which was acceded to after some controversy, but with the understanding that thereafter the contract would be terminated. The petitioner, under these circumstances, loaded the ship, and during the progress of the work ascertained that she was under charter to the Sabine Export Company, but made no inquiry as to the terms of the charter party, and in no manner brought to the attention of the ship's master that he would hold the ship liable for his services. Upon completion of the loading, he presented his account against the export company to McReynolds, the president, who gave him the draft of that company on the company at its office in Orange, Tex., which draft was not paid, the company having become bankrupt, though it seems that it had money in bank sufficient to pay said draft at the time it was given. Meantime the ship had sailed to its point of destination, and, stopping at the port of Norfolk to coal, was libeled within the jurisdiction of this court.

It is quite apparent from the evidence that the owners of the ship had no representative, other than its master, at Sabine, Tex., clothed with authority to make contracts to bind the ship, though it seems that McReynolds & Co., as ship brokers, for a commission paid them, made certain advances to the ship for its necessary expenses, and drew upon the owners for the amount so advanced. The petitioner contracted exclusively with the charterers, who themselves were liable for the stevedore's charges, and were without apparent authority to bind the owners of the vessel therefor; and took no precaution whatever to ascertain the source of their authority; and subsequently, when put upon inquiry, on finding that the ship was under charter, utterly failed to follow up the source of information thus coming to his knowledge as to the authority of those for whom he was acting; nor did he make any claim or demand whatever against the master of the ship for the amount due. If, during the progress of the loading of the ship, on ascertaining the fact of the existence of the charter, a suggestion even had been made to the master thereof that demand would be made against her for these charges, the petitioner would have been protected, and at least the ship would have been relieved of responsibility, as the work could have been suspended. Under the terms of the charter party, the ship was not interested in the service being performed by the stevedore, as her freight money would have been earned in any event, and at least it was incumbent upon the petitioner, if he purposed to assert a claim of this character, to have advised the master of the ship, upon information coming to him of the existence of the charter and of its provisions, that he would look to the ship for the payment of his services. This, however, he utterly failed to do, and instead continued to complete his work, accepted a draft from the charterers for the amount due him, and allowed the ship to go to sea on her return voyage in absolute ignorance of the fact that even the assertion of a claim was contemplated against her. However much services of the character in ques-

tion may be looked upon with favor by courts of admiralty, it would be both unfair and unjust to the shipowners to allow the claim asserted in this case. The Suliote (D. C.) 23 Fed. 919–926; The Burton (D. C.) 84 Fed. 999; The Kate, 164 U. S. 458, 17 Sup. Ct. 135, 41 L. Ed. 512; The Valencia, 165 U. S. 264–270, 17 Sup. Ct. 323, 41 L. Ed. 710.

In what has been said, sight has not been lost of the fact that ordinarily, where a necessary maritime service is rendered to a foreign vessel, upon the application of the master, or in his behalf, the presumption is that it is rendered upon the credit of the vessel, and the burden of proof is upon those who contend otherwise (The Grapeshot, 9 Wall. 141, 19 L. Ed. 651; The Lula, 10 Wall. 192, 19 L. Ed. 906; The Patapsco, 13 Wall. 329, 20 L. Ed. 696); nor of the trouble that is frequently encountered, when not actually dealing with a ship's master, in determining who has the right to speak for the ship; the duties of consignees or agents of ships, or the agents of charterers or owners, being so similar and undistinguishable that, without some positive knowledge of their relations, contracts, or agreements, it is difficult to determine to which class of agents they belong. Particularly is this true as to stevedores, who are not always experienced business men; but the requirement, even as to them, would not seem to be unreasonable, that imposed the obligation to see that the person with whom they contracted, other than the ship's master or owner, had authority to represent the owners and bind the ship; and, if not satisfied as to their authority, to advise the ship's master that the ship would be looked to for the payment of services to be performed. This would enable the stevedore, in any case, by notifying the master of the ship, before proceeding with the work in hand, to amply and fully protect himself.

The petition will be dismissed, with costs.