# THE GUL DJEMAL.

(District Court, S. D. New York. April 7, 1925.)

1. Shipping ⬡⟹50—Owner cannot be held liable because of misrepresentations by charterer as to its authority.

Owner of ship cannot be held liable for stevedoring services, because the charterer, for his own purposes, made misrepresentations as to his authority.

2. Maritime liens ⬡⟹25—Claim for stevedoring services in loading coal on ship at instance of charterer does not come within federal Maritime Lien Act.

Claim for stevedoring services in loading coal on ship at instance of charterer without authority from the owner does not come within Maritime Lien Act, § 1 (Comp. St. § 7783).

3. Shipping ⬡⟹58(2)—Evidence held to show that stevedore made contract with agent of charterer.

Evidence *held* to show that stevedore made contract with agent of charterer, relying entirely on its credit, and that subsequently the agent endeavored to change contract, to make it appear that ship was liable.

4. Shipping ⬡⟹50—Stevedore should have used reasonable diligence to ascertain whether contract for loading coal on ship was at instance of owner or charterer.

It was duty of stevedore, before loading coal on ship, to use reasonable diligence to ascertain whether order was given at instance of owner or of charterer.

5. Shipping ⬡⟹50—Charterer does not have authority to bind ship for claims of stevedore.

Charterer does not have authority to bind ship for claims of stevedore.

In Admiralty. Libel by Rees J. Evans against the steamship Gul Djemal. Libel dismissed.

Decree affirmed 11 F.(2d) 156.

Henry M. Stevenson, of New York City, for libelant.

Purrington & McConnell, of New York City (by John W. Griffin), for claimant.

GODDARD, District Judge. This suit and one brought to recover for wharfage and other items were tried some months ago, and, at the request of counsel, decision has been deferred. The other case now having been disposed of by them, this one alone remains to be decided.

The suit, which is in rem, was brought to recover $3,944.44 for stevedoring services rendered in connection with the loading of 1,800 tons of coal on the steamship Gul Djemal between November 15 and November 26, 1920, while she was in the port of New York. Claimant defends on the ground that the vessel was under charter, and that the libelant knew, or upon reasonable inquiry, which should have been made, could have ascertained, this, and therefore that the charterer, and not the vessel, is liable, as the contract was made with the charterer's agent.

## Facts.

The Gul Djemal (formerly the Germanic of the White Star Line) was owned, at the times hereinafter referred to, by the Turkish government, and was, by a charter executed at Constantinople on September 4, 1920, chartered to one George Dedeoglou for a return voyage from Constantinople to New York. The charter was in the Turkish language, and there have been two translations submitted; one made in May, 1921, and the other the day previous to the trial. In both of these translations, it is quite apparent that the charterer, and not the owner, was to provide and pay for such services as are the subject of this suit.

The charterer, Dedeoglou, appointed the Mt. Royal Steamship Company, Limited, of New York, his agent by written contract, dated October 5, 1920. This was executed at Constantinople, and a copy sent forward to New York by mail on October 15th, arriving in New York about November 1st. Cables were also sent by Dedeoglou to the Mt. Royal Steamship Company, and on October 23, one Dilsizian, who was connected with the Mt. Royal Steamship Company arrived in New York with further information about the charter. A wireless message was received by the Mt. Royal Steamship Company from Dedeoglou, asking that the Mt. Royal Steamship Company's representative meet him on board upon the arrival of the vessel in New York harbor.

The uncontradicted testimony is that the Mt. Royal Steamship Company never received from the Turkish government instructions or communications of any nature in connection with the vessel. The instructions as to docking were given to her chief officer by the charterer. The Mt. Royal Steamship Company attended to the various matters connected with the entry of the vessel and arranged for supplies. Both the charterer, who was on board when the vessel arrived in New York on October 31, 1920, and the master, had copies of the charter party. The stevedoring services for which Evans is suing were arranged for by the Mt. Royal Steamship Company and Evans' representative between the 5th and 10th days of November. The work was begun on November 15th, and finished on November 26th. On November 13th, the following letter was sent:

"New York, Nov. 13, 1920.

"SS Gul Djemal and/or Owens, Mt. Royal S. S. Co., Ltd., Agents, 17 Battery Place, New York—Dear Sirs: It is understood and agreed that the bunkering of the above steamer of 2,000 tons of coal will be at the rate of $1.10 per ton, including compensation and public liability insurance. Extra trimmers, when required, to be billed on the extra labor basis plus 10 per cent. Also any detentions beyond our control, such as breasting off ship, shifting and hauling of lighters, and rain, to be charted for on the extra labor basis plus 10 per cent. Overtime, when ordered through your office, to be at the rate of 50 cents per hour per man, exclusive of meal hours. Any change in the labor rates or insurance will mean a reduction or increase in prices. Very truly yours, Rees J. Evans, Gen'l Stevedore, [Signed] M. E. Graham, Secretary.

"Accepted."

This letter was answered by the Mt. Royal Steamship Company by written acceptance of its terms, and with it a letter from the Mt. Royal Steamship Company to Evans, stating that it must be distinctly understood that the acceptance was made on behalf of the Mt. Royal Steamship Company "as agents for the vessel, or her owners," and that the Mt. Royal Company was to be in no wise responsible for loading the coal or payment of Evans' bills. During the cross-examination of Mevrouz, the treasurer of the Mt. Royal Company, who was the officer of that company in charge of all the transactions in connection with the Gul Djemal, and who had previously testified that the Mt. Royal Company represented the charterer, and not the owner, and that it had never had any communications from the owner, testified that he had verified a libel against the Gul Djemal filed in behalf of the Mt. Royal Company, his verification being made on December 2, 1920, and that the libel therein contained the following paragraph:

"At various dates between October 31, 1920, and November 22, 1920, your libelant, upon the special instance and request of the captain and owners of said vessel, and upon her credit, advanced and paid out the sum of $24,990.35 at the port of New York for supplies, water, and services furnished the said vessel and necessary for her maintenance between said dates."

[1] No satisfactory explanation of these inconsistencies was, or probably could be, made, and the decision in this case is in no wise to be considered as a certificate of character for this witness. But the owner cannot be held liable for this reason, or because the charterer, for his own purposes, made misrepresentations as to its authority, and the original question remains: Did the owner, or any one, with its direct or implied authority, contract for these stevedoring services? No representative of Evans ever inquired whether the Gul Djemal was under charter, or asked to see any evidence of authority for the Mt. Royal Steamship Company to act as agent for the owner. No notice was given to the master by the libelant that it proposed to hold the Gul Djemal liable.

Evans testified that his foreman, Hanson, told him that he had "worked two ships for them (Mt. Royal), and that they were good payers." He testified further:

"Q. Did you make any investigations as to who owned the ship? A. No, sir.

"Q. Did you understand that the Mt. Royal owned her? A. No; we never make inquiries of that nature when we get work from an agent in New York City.

"Q. You really did not care who owned her? A. As long as they were reliable, we took the work on their say-so. * * *

"Q. I suppose, from what you say, that you did not make any inquiries about whether the ship was chartered from (to?) anybody? A. No.

"Q. You did not ask the captain? A. No. * * *

"Q. So far as the relation of the Mt. Royal to the ship goes, you had no conversation on that point? A. Absolutely none."

Hanson, the foreman, testified that, when he was connected with another company, he had done work on two Mt. Royal ships, and he supposed this was another Mt. Royal, and that was as far as he went in his investigation. He did not have any talk with the captain, or any one, as to whether the ship was chartered.

The master himself testified that he knew nothing about the arrangement, and that the Mt. Royal was not the agent of the ship or its owners. It is also to be noted that then there did not seem to be a necessity for binding the ship.

[2] This claim for stevedore services does not come within the federal Maritime Lien Act. Act June 23, 1910, c. 373, § 1 (Comp. St. § 7783). Cunard S. S. Co. v. United States, unreported decision of Judge Learned Hand of January 4, 1922; The Suelco (D. C.) 286 F. 286; The Andrew J. Smith (D. C.) 263 F. 1004.

[3] It seems clear that misleading statements, made by the agent of a charterer as

to whom he is acting for, cannot alone bind the owner of the ship. I think it is evident, from the testimony and correspondence, that Evans made his contract with the Mt. Royal Steamship Company, relying entirely on its credit, and that subsequently, the latter realizing that it might be held for the bills if Dedeoglou did not pay, the Mt. Royal Company endeavored to change the contract, so that it was made to appear that the ship was liable, and that they represented the owner and had authority to bind the ship. The libelant was not relieved from investigating what the Mt. Royal's connection with the vessel was, merely because he was informed by the Mt. Royal that they represented the owner and were acting as agent for the vessel; that was the very thing he should have investigated, unless he was willing to rely upon their statement. He should have required evidence of the fact; if he chose to rely upon it without further substantiation, he, and not the owner, would seem to be the logical sufferer.

Evans could have asked to see their authority, or perhaps done what was less embarrassing, inquired from the master of the Gul Djemal, with whom he was in daily contact while the coal was being loaded, whether the ship was under charter, and, if so, for whom was the Mt. Royal Company acting; and if the master had stated that they were the owner's agents, we might have a different situation presented. But it is quite apparent that Evans was not interested in this, and that he was content to look to the Mt. Royal. There was no indication that the master would not have told him the truth, if for no other reason that that of self-interest and that of his own employer. The master's actions in receiving the coal on board, and in connection with the entry of the ship at the custom house upon her arrival in New York, were merely such as his duties as master required, irrespective of whether the ship was being operated by the owner or by the charterer.

There was a juggling of names by the Mt. Royal Steamship Company, Limited (Dilsizian Bros.), and this, with its subsequent attempts by correspondence to fasten the liability on the owners, would seem to be further reasons for putting Evans upon his guard, and to cause him to ascertain definitely just what authority the Mt. Royal Steamship Company, Limited, had, and from whom.

In the Liberator (D. C.) 298 F. 159, the court quotes with approval an article by Mr. Robert M. Hughes on Maritime Liens in 26 Cyc. p. 783, containing the following:

"The very fact that supplies are ordered by any one else [than the master] makes a prima facie case against an intent to charge the vessel, and ought to put the materialman on inquiry as to the extent of such person's power."

[4] It was the duty of the libelant to use reasonable diligence to ascertain the facts. The West Haven, 297 F. 534, 1924 A. M. C. 681.

[5] Dedeoglou was not the owner of the Gul Djemal pro hac vice, as that condition could only arise under a demise (Leary v. U. S., 81 U. S. [14 Wall.] 607, 20 L. Ed. 756), and therefore did not have authority to bind the ship.

The idea that the owner could be held liable for stevedoring services contracted for by the time charterer, under the circumstances existing here, seems to me contrary to the general principles of law, and to further illustrate what was stated by Circuit Judge Hough in The Saturnus, 250 F. 407, 414, 162 C. C. A. 477, 484 (3 A. L. R. 1187):

"This litigation exemplifies a common tendency to regard any floating property used in the performance of a contract as in some sort a pledge or surety for satisfactory performance; such security to be enforced by asserted maritime lien. No such principle is known to the admiralty."

The facts of the case at bar are not similar to the facts in Virginia Shipbuilding Corporation v. United States (D. C.) 292 F. 440, recently decided by Circuit Judge Waddill, and strongly urged by counsel for libelant as supporting his contention. In that case the relationship between the operating company and the owner was quite different, and moreover the United States was to benefit from the earnings of the ships.

The following support my conclusion that the libelant cannot hold the owner, or the Gul Djemal, for the services which he rendered: The Kate, 164 U. S. 458, 17 S. Ct. 135, 41 L. Ed. 512; The Valencia, 165 U. S. 264, 17 S. Ct. 323, 41 L. Ed. 710; The Clio, 260 U. S. 482, 43 S. Ct. 181, 67 L. Ed. 361; The Neponset, 300 F. 981, 1924 A. M. C. 726; The Chicklade (D. C.) 120 F. 1003; The Ville de Djibouti (D. C.) 295 F. 869; The Princess Matoika (D. C.) 298 F. 153.

The libel is dismissed, but without costs.