Fecteau, J.
Plaintiff, Bradley Goodrich (Goodrich) brought this action against his former employer, CML Fiberoptics, Inc. (CML), its corporate parent, Chicago Miniature Lamp, Inc. and its employee stock option plan administrator, Ronald S. Goldstein (collectively *602 the defendants) after he was discharged. The issues are whether Goodrich has a claim to his unvested stock options because of an alleged breach of the implied covenant of good faith and fair dealing under Massachusetts law, and whether he is entitled to compensation for past services and unused vacation time. The defendants argue that the termination of Goodrich’s at-will employment was neither in bad faith, nor in deprivation of any earned compensation for past services.
For the reasons set forth more fully below, the defendants’ motion for summary judgment is ALLOWED in part and DENIED in part.
BACKGROUND
The undisputed material facts, as established by the summary judgment record, areas follows. In 1991, Goodrich became employed as the comptroller, vice president and treasurer of a company called Electro Fiberoptics Corporation (EFO). In the course of his employment, he and another individual not here relevant, obtained a loan on behalf of EFO, and in so doing, executed personal guarantees securing the note. Sometime thereafter, EFO refinanced the loan with BankBoston which then, in turn, loaned EFO several million dollars, again secured by Goodrich’s and another’s personal guarantees.
EFO subsequently defaulted on its obligation and BankBoston obtained control of the business. Ultimately, BankBoston began collecting most of EFO’s income and applying it towards the outstanding defaulted loan balance. Sometime in 1995, Chicago Miniature Lamp, Inc. (Chicago), through its wholly owned subsidiary, CML Fiberoptics, Inc. (CML), expressed an interest in purchasing the distressed EFO business. Chicago agreed to pay off EFO’s loan to BankBoston and otherwise release Goodrich’s personal guarantee on the note in exchange for ownership of the company. A deal was struck.
On November 30, 1995, Goodrich transferred his stock in EFO to CML, and by the first week in December, the deal was complete: CML had acquired EFO.[2]
After its acquisition, Chicago left EFO’s former management, including Goodrich, in place as a transition team. CML did not, however, renew his contract; Goodrich was thus converted into the familiar “employee-at-will.” His salary, though, remained the same, roughly $67,000.
On December 4, 1995, approximately five (5) days after transferring his stock to CML, and at about the time that CML acquired EFO, CML granted Goodrich 10,000 shares of stock options. Goodrich, however, did not learn that he had been granted options until later in the month.
In general, the underlying Incentive Stock Option Plan (Plan) provided for the staggered or periodic vesting of the options over three years beginning on December 4,1996 and ending December 4, 1998.[3]The Plan further provided that if Goodrich was terminated, his right to exercise the options would extinguish ninety (90) days thereafter.[4]
Sometime in late May or early June 1996, the defendants began taking steps to restructure, and then terminate Goodrich’s position. On July 1, 1996, CML hired Kevin MacMaster to replace Goodrich.
On August 13, 1996, CML discharged Goodrich allegedly due to “corporate restructuring.” As of that date, Goodrich had not been paid for two days of work and had accumulated sixteen (16) days of unused, and unpaid vacation time. Goodrich admits, however, that CML paid him $9,450 as severance pay (representing fifteen (15) days of unused vacation time plus one month of additional pay at a rate of $257.00 per day) although it was not obligated[5] to do so.
Pursuant to the Plan, ninety (90) days later, on or about November 13, 1996 — roughly three weeks prior to the first scheduled vesting date — Goodrich’s options terminated.
Goodrich brought this action to seeking, inter alia, reinstatement to his former position and the right to continue participation in the Plan, back pay plus interest from August 13, 1996 to the present and front pay to the date of retirement, and costs of this suit. The defendants argue that based on the undisputed record as set forth above, they are entitled to judgment as a matter of law. I disagree.
DISCUSSION
I. Standard of Review
The function of summary judgment is to “pierce the boilerplate of the pleadings and assay the parties’ proof in an effort to determine whether trial is actually required.” Harris v. Harvard Pilgrim Health Care, Inc., 20 F.Sup.2d 143, 146-47 (D.Mass. 1998), citing McIntosh v. Antonino, 71 F.3d 29, 33 (1st Cir. 1995). The criteria are familiar: this court grants summary judgment where there are no genuine issues of material fact, and if, viewing the entire record in a light most flattering to the nonmovant, the proponent demonstrates its entitlement to judgment as a matter of law. Cassesso v. Comm’r of Correction, 390 Mass. 419, 422 (1983); Community Nat’l Bank v. Dawes, 369 Mass. 550, 553 (1976); Mass.R.Civ.P. 56(c). This may be done, inter alia, by showing an absence of evidence to support the plaintiffs’ position. Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991).
Once the defendants have carried this burden, the onus shifts to the plaintiffs. “In order to survive the swing of the summary judgment axe,” Mack v. Great Atlantic and Pacific Tea Co, Inc., 871 F.2d 179, 181 (1st Cir. 1989), the plaintiffs must produce evidence on which a reasonable finder of fact could base a verdict for them. See McKenzie v. Brigham & Women’s Hosp., 405 Mass. 432, 437-38 (1989); Michaelson v. Digital Financial Servs., 167 F.3d 715, 720 (1st Cir. 1999) (same). If the plaintiffs cannot produce such evidence, *603 the motion must be granted. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). They cannot “rest on the mere allegations or denials of their pleading.” Baker v. Monga, 32 Mass.App.Ct. 450, 453 (1992); Kourouvacilis, supra at 716; Lalonde v. Eissner, 405 Mass. 207, 209 (1989).
II. Merits of the Defendants’ Motion A. Count I (sic)[6] — Breach of Covenant of Good Faith and Fair Dealing
In this case, there is no argument that Goodrich was an employee-at-will who could be terminated for virtually any reason or no reason at all. Jackson v. Action for Boston Community Dev., Inc., 403 Mass. 8, 9 (1988). Moreover, Goodrich does not claim, either expressly or reading his complaint broadly so as to do substantial justice, that CML or any other defendant breached or violated any type of contractual obligations. Compare Chilson v. Polo Ralph Lauren Retail Corp., 11 F.2d 153 (D.Mass. 1998); Mass.R.Civ.P. 8(f). The issues so framed by the parties have thus been significantly narrowed for the court. The question here of paramount concern is whether CML’s termination of Goodrich was in violation of the implied covenant of good faith and fair dealing. Fortune v. National Cash Register Co., 373 Mass. 96 (1977).
In Fortune, the Supreme Judicial Court recognized that an employer may not in every instance terminate its at-will employees without liability. Balancing an employer’s right to control its work force, and an employee’s legitimate expectation of compensation for work already performed at the time of discharge, the Court enunciated the subsequently oft repeated principle that implied in every employment contract is the covenant of good faith and fair dealing. 373 Mass. at 104-05. This rule is impressed upon such contracts to “prevent overreaching by employers and the forfeiture by employees of benefits almost earned by the rendering of substantial services.” Id.
With the above rubric in mind, to survive the summary judgment axe, at this stage of the proceedings Goodrich must demonstrate by a preponderance of the evidence that he was discharged (1) in bad faith, (2) to deprive him of past or earned compensation. The analysis becomes increasingly more complex, though, when the underlying alleged deprivation concerns un-vested stock options and the issue before the court is, as here, whether the options relate to “past” or “future" services. See Sargent v. Tenaska, Inc., 108 F.3d 5, 8 (1st Cir. 1997).
1. Bad Faith
The defendants contend that there is no evidence of bad faith, and that as an employee-at-will, they could have fired Goodrich at any time, with or without cause. While it may be true that as an employee-at-will, Goodrich was employed virtually at the whim of his employer, Fortune teaches that CML’s decision must not have been motivated by bad faith. Fortune, 373 Mass. at 103. If CML’s decision was improperly motivated, the covenant has been breached. Goodrich argues that his discharge (for all practical purposes) within three weeks of the first scheduled stock option vesting date was motivated by CML’s desire to bar him from exercising his rights and thus in bad faith.
In support of this contention, Goodrich relies on the timing of his discharge, and on the holding of Thompson v. Sundance Pub., Civil Action No. 95-0274, 1997 WL 1294367 (Mass. Super. 1997) [8 Mass. L. Rptr. 172 (April 27, 1998)].
In Thompson, the plaintiff began working for the defendant on February 1, 1994 after being promised a 1.5% equity interest in the business. The first 0.5% of the equity interest was scheduled to vest after the first 12 months of employment on February 1, 1995. As early as November 1994, however, the defendant had in mind a replacement for the plaintiff and in January 1995, less than one month before his first equity interest would have vested, the defendant discharged the plaintiff allegedly for “economic reasons.” Id. at * 1. The defendant never explained that the plaintiff was being fired for poor work performance. Id. at 5.
The plaintiff sued to recover the first 0.5% equity interest alleging that the defendant had breached the implied covenant of good faith and fair dealing. In denying the defendant’s motion for summary judgment, the Court found that the plaintiff had set forth sufficient facts to place the defendant’s true motivations in dispute in discharging him and warranted submission of his claim to the jury. Id. at 4-6.
Here, as in Thompson, Goodrich was discharged (for all practical purposes) within one month before his first options would have vested and thus prevented from obtaining an equitable interest in his employer, the defendant CML. Furthermore, CML “had in mind” a replacement for Goodrich as early as May or June 1996, and never explained that Goodrich had been discharged for poor work performance.
As decided by Thompson, when viewing the evidence in a light most favorable to him, this court concludes that, as a bare minimum Goodrich has set forth sufficient countervailing materials to withstand the instant motion by placing in dispute the true motivations of the defendants in terminating him. Goodrich is entitled to a jury determination as to whether the defendants’ actions were in bad faith.
2. Past or Earned Compensation
Goodrich maintains that the stock options granted to him in December 1995 were granted as a result of his previous work that he performed for CML from December up to and including the date of his discharge on August 13, 1996. In contrast, the defendants argue that as a well compensated employee-at-will who was terminated prior to the vest *604 ing of his stock options, Goodrich is entitled to nothing.
The First Circuit Court of Appeals touched upon this very issue in Sargent v. Tenaska Inc., supra. In Sargent, the plaintiff, as part of his compensation package and in addition to his salary, was granted certain ownership interests in his employer’s building projects developed subsequent to his employment start date; his ownership rights were to be made available beginning twelve months after he began work and periodically vest over time. After he was terminated, the plaintiff sued to recover his unvested “ownership interests.” 108 F.3d at 7.
In rejecting the plaintiffs claim, the Court held that since the plaintiff did not limit his demands to the vesting period up to the date of his discharge, but instead “chose[ ] to argue that yet unvested interests from all then-occurring and future vesting periods [were] related to past compensation,” his unvested “ownership interests” were oriented towards compensating him for services not yet provided, and were thus not compensable under Fortune. Id. at 9 (emphasis in original). The court, however, acknowledged that:
a good argument could be made that, where a colorable periodic vesting period is provided, the parties should be taken to have settled between themselves the issue that the Fortune doctrine itself seeks to mediate: how much of the promised future compensation should be treated as already earned prior to the discharge ... If the employee was fired in bad faith a month before completion, it is doubtful that Fortune could be shrugged off by saying that the interest had not vested ... a colorable periodic vesting schedule crudely delineates the line between past and future services. While Sargent remained at the company, his past services grew; but so too did his vested interests . . . (his) unvested interests were largely associated with future services not protected under Fortune. We say “largely” because within the single vesting period embracing the date of discharge, one could make an effort to distinguish and protect services already performed between the start of that period and the date of discharge.
Id. at 8-9.
Here, Goodrich makes precisely the claim that Sargent either overlooked or failed to consider, and reiterates the plaintiffs position in Thompson, supra; namely, whether his unvested options — covering only the vesting period from the date they were granted to the date of discharge — constitute consideration for “past,” as opposed to “future” services, and are thus compensable under Fortune. In contrast, the defendants assert that since Goodrich was paid a salary, and was not aware at the “outset" of his employment that he had been granted options, they constitute, as a matter of law, nothing more than expectancies that were anticipated as an incident of future employment, and not legitimately expected compensation for past services. They cite to and rely on Chilson v. Polo Ralph Lauren Retail Corp., 11 F.Sup.2d 153 (D.Mass. 1998).
The undisputed facts of this case, however, are distinguishable and do not support the defendants’ contention. In Chilson, the plaintiff sued her employer alleging that her discharge (on April 15, 1997) was to prevent her from participating in the defendant’s anticipated initial public offering (announced on May 7, 1997) and thus in breach of the implied covenant of good faith and fair dealing. In allowing the defendant/employer’s motion for summary judgment, the Court found that since the plaintiff was neither aware •that the defendant was planning on granting stock options, nor expecting to receive compensation above and beyond her normal salary on the date she was terminated, she had no Fortune claim for benefits “fairly earned and legitimately expected.” See id. at 158.
Here, Goodrich began working for CML in December 1995. Approximately five days after accepting employment, CML awarded Goodrich stock options “as a performance incentive.”[7] That Goodrich did not learn that he had been granted options until later in the month is inapposite. See Cataldo v. Zuckerman, 20 Mass.App.Ct. 731, 732-33 (1985) (plaintiff began work on August 2, 1971 and was given enforceable “partnership interests” on November 3, 1971).
Moreover, unlike Chilson who was no longer working for her employer when she first learned that she would have been granted options if she still worked for it, Goodrich continued working for CML (and worked for the next eight months) after learning that he had actually been granted options.
Based on the foregoing, this court finds that, taking the reported evidence in a light most favorable to Goodrich, CML’s incentive Plan served as a sufficient impetus in motivating his work performance. This court further finds as a matter of law that the granted options — covering only the date initially granted to the date Goodrich was terminated — constitute sufficiently “identifiable, future benefits . . . reflective of past services,” that fall under the principles articulated in Fortune. See Sargent, supra at 7, citing Gram v. Liberty Mutual Ins. Co., 384 Mass. 659, 673 (1981). But see Olsen v. Seifert, Civil Action No. 97-6456, 1998 WL 1181710 (Mass. Super. 1998) [9 Mass. L. Rptr. 268 (January 18, 1999)].
The defendants’ motion for summary judgment is thus denied as to Count I of Goodrich’s complaint.
B. Count II — Violation of G.L.c. 149, §150
Finally, Goodrich maintains that notwithstanding the defendants’ admittedly unnecessary severance package (representing fifteen days of unused vacation time plus one month of additional pay), he is entitled to payment for sixteen (16) days of unused vacation time and two days of work for a total of eighteen (18) *605 days. Accordingly, he argues that he is entitled to $4,639.50 under G.L.c. 149, §150.
The Massachusetts Payment of Wages Statute, G.L.c. 149, §148 et seq., requires employers to pay their employees wages at least every other week, unless an eligible employee elects to be paid monthly.[8] Employees who are discharged from their employment must be paid in full on the day of the discharge. Id. Although the statute provides that “wages” shall include holiday or vacation pay, it does not provide a specific definition for the term. Id. An employee aggrieved by the violation of the statute has a private civil right of action for injunctive relief and damages, including treble damages for loss of wages and other benefits, attorneys fees, and litigation costs. G.L.c. 149, §150.[9] See Scott v. Granada Computer Services, Inc., Civil Action No. 95-3429, 1996 WL 1186807, (Mass.. Super. Ct. May 2, 1996) [5 Mass. L. Rptr. 351 (July 15, 1996)].
Here, there is no dispute that when he was discharged, Goodrich was entitled to be paid for two days’ work and sixteen days unused vacation time. After he was terminated, however, Goodrich admits that CML paid him $9,450 as severance pay, representing fifteen days of unused vacation time plus one month of additional pay, although not obligated to do so. There being no evidence that Goodrich was not paid “on the day of discharge,” this court finds that he has utterly failed to demonstrate, with either countervailing materials or relevant and supporting legal jurisprudence, that he is entitled to anything more than he received upon termination of his at-will-employment.
Judgment shall enter in favor of the defendants on Count II of Goodrich’s complaint.
ORDER
For the reasons set forth above, it is hereby ORDERED that the Defendants’ Motion for Summary Judgment is DENIED as to the plaintiffs allegation that the defendants breached the implied covenant of good faith and fair dealing.
It is further ORDERED that the Defendants’ Motion for Summary Judgment is ALLOWED as to the allegations that the defendants failed to fully compensate the plaintiff in violation of G.L.c. 149, §150.

 Affidavit of Bradley Goodrich (“Goodrich Aff.’’); Deposition of Ronald Goldstein (“Goldstein Depo.’j at 18 attached to Affidavit of Anthony E. Fuller (“Fuller Aff”) as Ex. C.

 Specifically, one-third of Goodrich’s options were to vest on December 4, 1996, one-third on December 4, 1997 and one-third on December 4, 1998. The exercise price was established at $20.50 per option share.

 At no time did any representative or agent from Chicago inform Goodrich that (1) the Plan was intended to represent deferred or added compensation for his employment with CML, (2) Goodrich could expect to continue work for the duration of the Plan, or (3) that the purpose of the Plan was to reward him for past performance.

 See Bradley Goodrich Deposition (“Goodrich Depo.") at 96-97 attached to Fuller Aff., at Exhibit A.

 Goodrich’s complaint does not expressly, or rather fails to delineate a “Count I." Reading the complaint as a whole, however, it is apparent that this was likely his intention. Thus, for purposes of clarity for the reader and internal consistency, this court has chosen to refer to Goodrich’s covenant of good faith and fair dealing claim as one under “Count I.”

 See Bradley Goodrich Deposition Exhibit 3 attached to the Fuller Aff. as Exhibit E.

 General Laws c. 149, §148, provides, in relevant part: “Every person having employees in his service shall pay weekly or biweekly each such employee the wages earned by him to within six days of the termination of the pay period during which the wages were earned if employed for five or six days in a calendar week, or to within seven days of the termination of the pay period during which the wages were earned if such employee is employed seven days in a calendar week. .. but. . . any employee discharged from such employment shall be paid in full on the day of his discharge . . . The word ‘wages’ shall include any holiday or vacation payments due an employee under an oral or written agreement.
“Whoever violates this section shall be punished by a fine of not less than five hundred nor more that three thousand dollars or by imprisonment in a house of correction for not more than two months, or both.”

 GeneralLaws c. 149, §150, as added by St. 1993, c. 110, §182, provides, in relevant part: “Any person claiming to be aggrieved by a violation of section one hundred and forty-eight . . . may, at the expiration of ninety days after the filing of a complaint with the attorney general . . . institute and prosecute in his own name and on his own behalf... a civil action for injunctive relief and any damages incurred, including treble damages for any loss of wages and other benefits. An employee so aggrieved and who prevails in such an action shall be entitled to an award of the costs of the litigation and reasonable attorney fees.”