ROBERT E. GRAM *vs.* LIBERTY MUTUAL INSURANCE
COMPANY.

Middlesex.  May 5, 1983. — March 6, 1984.

Present: HENNESSEY, C.J., WILKINS, LIACOS, ABRAMS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Contract*, Employment. *Damages*, Breach of employment contract.

Where, on appeal in an action by an insurance salesman against his former
   employer, which had discharged him without cause, this court had
   concluded that the plaintiff was entitled to recover the amount of his
   anticipated policy renewal commissions based upon his past services,
   adjusted for the time he would have spent in servicing those policies, it
   was error of law for the judge at a second trial limited to the issue of
   damages to permit the jury to consider, as elements of damages, items
   of future compensation based wholly upon the plaintiff's length of
   service as a sales representative ("career credits") [334-336], and com-
   missions expected to arise in the future from enhancements of existing
   policies sold by him ("endorsements") [336-337].  LIACOS, J., joined by
   ABRAMS and NOLAN, JJ., dissenting, was of the view that the judge had
   acted properly within the scope of this court's instructions on remand.
   NOLAN, J., dissenting.

CIVIL ACTION commenced in the Superior Court on
February 24, 1977.

After review by this court, reported at 384 Mass. 659
(1981), a new trial on the issue of damages was held before
*Umana*, J., a Municipal Court judge sitting under statutory
authority.

The Supreme Judicial Court granted a request for direct
appellate review.

*Kalvin M. Grove*, of Illinois (*Paul R. Garry*, of Illinois,
with him) for the defendant.

*Richard K. Donahue*, for the plaintiff.

WILKINS, J.  In *Gram* v. *Liberty Mut. Ins. Co.*, 384 Mass.
659, 673 (1981) (*Gram I*), we remanded "the case for a
determination of damages, measured by the amount of re-

newal commissions Gram reasonably could have expected
to receive, reduced to reflect the proportion of his time that
would reasonably have been expected to have been devoted
to the servicing of those renewal policies." We noted that
"Gram has made no specific showing of his loss of any other
identifiable, future benefit . . . reflective of past services to
Liberty." *Id.* We expressly stated that "[t]he amount of
the renewal commissions substantially proves the outer limit
of the compensation Gram lost for past service." *Id.* at 672
n.10. We pointed out that "Liberty benefited from its dis-
charge of Gram without cause" (*id.* at 672) and that the
failure to prove that Liberty Mutual Insurance Company
(Liberty) discharged Gram in bad faith did not relieve Lib-
erty of liability "for the loss of compensation that is so clear-
ly related to an employee's past service" (*id.*) as are renewal
commissions. On remand, a jury rendered a verdict in the
amount of $325,000 in favor of Gram. Liberty appealed,
and we granted Gram's application for direct appellate
review. The jury's verdict must be vacated and a new trial
must be ordered.

In spite of the direction that damages be measured, in
their "outer limit," by renewal commissions, the remand
judge improperly submitted to the jury the question of
Gram's right to career credits — future compensation for
future services that, under his compensation agreement,
was based on the length of Gram's service as a sales repre-
sentative. As a matter of law, career credits are not
"renewal commissions." They compensate for future, not
past, services, and are thus not recoverable in these circum-
stances.[1] *Kravetz* v. *Merchants Distribs., Inc.*, 387 Mass.
457, 463 (1982).

It is important to recall that Gram served as an employee
at will. He is not entitled to damages on the basis of a breach

---

[1] The applicable compensation plan provided for "a basic Career
Credit" of $7,500 a year for each person who had more than ten years of
direct sales or sales management experience with Liberty. The amount
paid as a basic career credit was wholly unrelated to the volume of busi-
ness previously produced by the employee.

of a contract for life or for a term of years. The recovery allowed Gram in our earlier opinion pressed to the limit the recovery allowed to an at-will employee discharged without cause. Two members of the court even rejected Gram's limited right to damages expressed in the court's earlier opinion. See *Gram I, supra* at 674 (Nolan, J., dissenting in part, concurring in part, with whom Lynch, J., joined). We must be careful not to approach the allowance of contract damages as if Gram had a contract for life or for a term of years. Our goal is and has been simply to deny to Liberty any readily definable, financial windfall resulting from the denial to Gram of compensation for past services.[2]

Liberty argues that on termination Gram was limited by his compensation agreement to certain final adjustments and no more. In its appeal in *Gram I,* Liberty did not rely on limitations expressed in Gram's compensation agreement. That agreement was not printed in the record appendix in *Gram I,* and we did not consider it. It is too late for Liberty to argue now that Gram's rights were limited by the terms of his compensation agreement. We need not, therefore, consider the terms of the agreement, or whether, by agreement, an employer and an employee may restrict the rights of an at-will employee to compensation based on the windfall to an employer who, by discharging the employee without good cause, deprives the employee of clearly identifiable future compensation reflective of the employee's

---

[2] In Justice Nolan's dissent on the question of awarding damages to Gram, he said (*supra* at 674): "The court has restructured an at-will employment agreement to reflect an imposed condition never heretofore recognized by this court and one of doubtful legitimacy." In dissenting to this opinion, Justice Nolan appears to have abandoned his previous position. If, as he thought, the earlier opinion improperly permitted "[t]he trier of fact to engage in extravagant speculation," *Gram I, supra* at 675, it would seem that now is the time to eliminate such speculation, not to endorse it.

The basic difference between the view of the court and the dissent of Justice Liacos lies in the court's determination that the words "renewal commissions" have a legal meaning and do not offer a question of fact for interpretation by the jury.

past services.[3]  There was no error in denying Liberty's motion for a directed verdict or its motion for a judgment notwithstanding the verdict.

The judge also permitted the jury to consider future commissions expected to result from endorsements on policies procured by Gram.  In *Gram I,* we did not discuss the question of the effect of endorsements on Gram's lost commissions.  Such endorsements result from changes in the policy coverage because of changes in the policyholder's circumstances, such as the purchase of a less expensive motor vehicle or making improvements in, or an addition to, a building.  Changes by endorsement might increase or decrease the premium owed by the policyholder.  The question of Gram's right to credit for anticipated policy endorsements will arise at any retrial of this case and, therefore, we discuss it.

Although the question is not free from doubt, we conclude that commissions on future endorsements and the consequences of any anticipated future inflation should not be included in the measure of Gram's damages.[4]  Future policy changes and future premium levels are speculative.  We think that Gram's damages should be measured by the amount of annual renewal commissions payable under his compensation agreement in effect at the time of his discharge, recognizing the renewal of coverage but disregarding the effect of endorsements.  Attrition in the block of business produced by Gram should be determined for each

---

[3] The remand judge permitted Liberty, over objection, to argue to the jury that Gram's employment agreement limited his damages.  That was more than Liberty was entitled to.

[4] The words "renewal commissions," which we used in *Gram I, supra,* strictly deal only with the renewal of business covering the same risks on the same terms and conditions.  See 4 G.J. Couch, Insurance § 26:400, at 372-373 (2d ed. 1960 & Supp. 1982), citing *Beardsley* v. *American Bonding Co.,* 200 A.D. 452, 457 (N.Y. 1922), modified on other grounds, 235 N.Y. 533 (1923) ("[I]t makes no difference whether the bond was renewed by a renewal certificate or by giving a new bond, providing the terms and conditions thereof were the same").

future year of his anticipated employment,[5] and anticipated future renewal commissions should be adjusted to present value. The calculation of Gram's damages should also reflect the proportion of Gram's time that would have been devoted to servicing renewal policies, but, because we exclude the effects of endorsements in measuring the renewal commissions recoverable, the portion of Gram's time reasonably expected to be devoted to servicing renewals should not include time devoted to handling endorsements.[6]

We reverse the judgment and remand the case for a new trial consistent with this opinion.

*So ordered.*

LIACOS, J. (dissenting, with whom Abrams and Nolan, JJ., join). In *Gram* v. *Liberty Mut. Ins. Co.*, 384 Mass. 659, 660 (1981) (*Gram I*), we held that the plaintiff in this case was entitled "to recover identifiable, reasonably anticipated future compensation, based on his past services, that he lost because of his discharge without cause."

The parties are agreed that, because this case went to trial for a second time on remand from this court, "[i]t is the duty of the trial court, unless in its discretion it permits new issues to be raised, to follow implicitly the terms of the rescript and not to travel outside what is there laid down, read in the light of the opinion on which it is founded." *Lannin* v. *Buckley*, 268 Mass. 106, 111 (1929). The major issue to be addressed on Liberty's appeal is whether the remand judge committed an error of law by exceeding the scope of our decision wherein we remanded this case for a new trial on the question of damages. See *Gram I, supra.*

---

[5] The actual attrition in the business produced by Gram may be ascertainable for the years since his termination and estimates can be made of anticipated future attrition.

[6] We have considered Liberty's other claims of error and find them to be without merit. These claims involved matters within the discretion of the judge.

Liberty made no claim that the measure of Gram's future renewal commissions should reflect his life and work expectancy. For the purposes of any retrial, we think Liberty should be held to have waived this point.

Cf. *Loschi* v. *Massachusetts Port Auth.*, 361 Mass. 714, 715-716 (1972).

In my view, the trial judge followed faithfully the views the court expressed in *Gram I*. It is unfortunate that the court now requires yet another trial in this case on the basis of allegedly erroneous instructions given to the jury.

In our decision, *Gram I, supra*, we found that the jury were warranted "in concluding that Gram's discharge was 'bad, unjust, and unkind' . . . contrary to Gram's reasonable expectations, and the product of inadequate investigation" (citation omitted). *Gram I, supra* at 670. After determining that the jury correctly concluded that Gram had been discharged without good cause, we went on to consider the question of liability on the part of the defendant. We declined to adopt, as a general rule, the principle that the discharge of an at-will employee without cause is, in itself, a violation of an employer's obligation of good faith and fair dealing. *Gram I, supra* at 672. Nevertheless, because of the windfall to, or unjust enrichment of, an employer as the result of such an employee's discharge, we concluded that "the obligation of good faith and fair dealing imposed on an employer requires that the employer be liable for the loss of compensation that is so clearly related to an employee's past service, when the employee is discharged without good cause." *Gram I, supra* at 672. We affirmed the judgment of the trial court as to the defendant's liability, but having rejected as inappropriate the standard under which the jury awarded the plaintiff damages, we concluded that the plaintiff was "entitled to recover identifiable, reasonably anticipated future compensation, based on his past services, that he lost because of his discharge without cause." *Gram I, supra* at 660. At the second trial conducted in 1982 as to the issue of damages, the trial judge observed: "I'm faced with [the remand decision] and I have to take all of the language. I just can't take one sentence. I've got to take all of the language and try to see if I can form an opinion from the entire language, not just one sentence. . . . The Court has set a new field up. And what they're doing is I think

they're giving us a feel and they can't put it all in one sentence, but I do have to consider this, the very first paragraph: 'He is, however, entitled to recover identifiable' — that's the key word — 'reasonably anticipated future compensation.'"[1]

The trial judge correctly concluded that we had remanded the case for damages to be determined by whether a windfall to, or unjust enrichment of, the employer resulted from the employee's loss of identifiable, reasonably anticipated future compensation based on his past service. *Gram I, supra* at 672-673 & n.10. We had determined, on the record before us in *Gram I,* that the windfall to, or unjust enrichment of, the defendant was the equivalent of the amount of future renewal commissions Gram reasonably could have expected to receive from existing insurance policies established with Liberty as a result of Gram's past efforts and services, if he had remained in the continued employment of Liberty. *Gram I, supra* at 671-672. The proportion of his time that normally would have been spent in servicing such policies was to be deducted from the amount due him in renewal commissions.[2] *Gram I, supra* at 672-673.

The parties were in disagreement at the second trial as to how the windfall or unjust enrichment factor should be defined. The plaintiff took the view that he was entitled to recover compensation, based on his past service, which the plaintiff reasonably could anticipate. The defendant took the view that only "renewal commissions" were to be considered.

---

[1] The second trial occurred prior to our decision in *Kravetz* v. *Merchants Distribs., Inc.,* 387 Mass. 457, 463 (1982). See *Maddaloni* v. *Western Mass. Bus Lines,* 386 Mass. 877, 884 (1982), and *Cort* v. *Bristol-Myers Co.,* 385 Mass. 300, 305 (1982). The court's reliance on *Kravetz, supra* at 334, seems inappropriate for this reason and, also, for the reason that *Kravetz* is, on its facts, inapplicable.

[2] The court now seems to qualify this prior ruling by stating that "because we exclude the effects of endorsements in measuring the renewal commissions recoverable, the portion of Gram's time reasonably expected to be devoted to servicing renewals should not include time devoted to handling endorsements." *Supra* at 337.

Determining that the date of Gram's termination, January 6, 1977, was the date from which to measure the plaintiff's reasonable anticipation of future compensation based on his past services, the trial judge ruled that the new compensation plan which had been put into effect by Liberty on January 1, 1977, five days prior to the plaintiff's discharge, was the appropriate means by which to calculate the plaintiff's future renewal commissions based on his past efforts.[3] However, the 1977 compensation plan changed the method of compensation for renewals from that referred to by this court in *Gram I*, and it resulted in semantic confusion at the second trial.[4] "Renewal" refers to the circumstances in which a policy holder annually decides whether or not to continue his insurance coverage with his insurance company by renewing his present insurance policy. There is no question that earnings attributable to an insurance salesman from the renewal of a policy constituted a windfall to the defendant.

It is the defendant's interpretation of the 1977 compensation plan that is the basis of its contention that the trial judge failed to adhere to the mandate of *Gram I*.[5] The de-

---

[3] No argument has been made by either party that the trial judge erred in limiting the evidence to the 1977 compensation plan.

[4] Under both the prior 1972 compensation plan and the new 1977 compensation plan, Gram received a base salary. To this biweekly salary were added any earnings, calculated under the particular compensation plan, resulting from a salesman's efforts. Such earnings or commissions were categorized and calculated differently under the different compensation plans. The prior plan spoke only of renewal credits. Under the 1977 compensation plan, "renewal credits," "endorsements," and "career credits" were key categories for the calculation of a salesman's earnings to be added to his biweekly salary.

[5] The defendant contends that, under the terms of the 1977 compensation plan, the "[t]entative final and final adjustment . . . constitute[d] a full and final settlement between the Company and [Gram] under this Plan," relying on *Feeney* v. *Metropolitan Life Ins. Co.*, 262 Mass. 238 (1928). Assuming *Feeney* still to be good law, the facts here are not analogous to those in *Feeney* where the court held that analogous provisions in an at-will contract ended the plaintiff's right to commissions. *Id.* at 241-242. Here, at the time of his discharge, Gram did not know, nor

fendant correctly argues that the windfall benefits to Liberty were to be measured by the amount of the renewal commissions the plaintiff could have expected in the future resulting from his past services. The defendant contends, however, that the "renewal commissions" referred to by us in *Gram I* were limited to the component in the 1977 compensation plan labeled "renewal credits." The plaintiff contends that, under the 1977 compensation plan, his reasonable expectancy of future "renewal commissions" must be read to include not only what the 1977 plan labeled "renewal credits," but also components labeled "endorsements" and "career credits." The trial judge permitted conflicting testimony to be presented to the jury by the expert witnesses whether "endorsements" and "career credits" related to lost future compensation based on past services from which benefits accrued to the defendant.

A professor of economics at Brandeis University was the expert witness for the plaintiff. He defined "endorsements" as the enhancement of an existing policy.[6] Since an "endorsement" was credited under the 1977 compensation plan to the salesman of the original policy, he felt, therefore, that "endorsements" were part of future "renewal commissions" for past services. He termed "career credits" as the base amount of commission compensation calculated by the length of a sales representative's past service with Liberty.[7] "Renewal credits" were flat fees that were added to the base compensation for the annual renewal of existing policies. Previously, "renewal credits" had been a percentage of the value of the premium of a renewed policy. For the thirty-

_____

had he seen, the new compensation plan containing such provisions, and he had not signed the 1977 compensation plan.

[6] An endorsement is a change initiated in a policyholder's insurance policy which is reflected as an amended coverage as well as a change in the amount of the premium to be paid.

[7] The phrase "career credits" appears for the first time under the 1977 compensation plan. We note that, under the 1977 compensation plan, "career credits" appear to be different from wages. Cf. *Kravetz, supra* at 463 (lost future wages are not recoverable).

one year period from the date of Gram's termination until his retirement at age seventy, plaintiff's expert calculated the plaintiff's future compensation for past services to be $301,800, at present value, using all three components and deducting 1% for servicing.[8]

An actuary for the John Hancock Mutual Life Insurance Company was the expert witness for Liberty. He did not include in his analysis the two components, "career credits" or "endorsements." His estimate for the component labeled in the 1977 plan as "renewal credits" was $63,674, reduced to present value but without a deduction for servicing time. When, on cross-examination by plaintiff's counsel, he was asked to include the other two components, the defendant's expert estimate of Gram's loss amounted to $261,790, reduced to present value.[9]

The plaintiff testified that he calculated his future compensation to be $375,185, using the three components under the 1977 compensation plan and deducting 1% for servicing time. The plaintiff did not calculate this figure at present value. Under the prior compensation plan, the plaintiff testified, without objection of defense counsel, that he calculated his future compensation, based on past services, to be $529,570. Although the plaintiff explained how he reached both figures, he did not break down the total compensation into component amounts.

Certainly, where conflicting testimony was presented as to the components comprising the renewal commissions we described in *Gram I*, the judge did not stray outside our earlier decision in permitting such testimony to be presented to the jury. The determination of what the plaintiff "rea-

---

[8] The plaintiff's expert calculated that $91,000 was generated by "renewal credits," $125,000 was generated by "endorsement credits," and $134,000 was generated by "career credits." He accepted Gram's testimony that 1% of his time was spent servicing existing policies.

[9] Both expert witnesses used Gram's actual previous retention rate for existing policies (93.6%) as the appropriate means to calculate Gram's future renewal compensation. The defendant did not introduce any evidence as to what actually happened to Gram's accounts after he was discharged.

sonably anticipated" as future compensation, based on past services, was a question of fact for the jury.[10] The court, however, incorrectly treats these questions as matters of law.

At closing argument, defense counsel was permitted to argue to the jury that endorsements were future new business, were immeasurable, and not properly part of the plaintiff's damages. He also argued to the jury that "career credits" were paid by Liberty for future services and that the plaintiff was entitled only to compensation for past services. Furthermore, he was permitted to argue that Gram had waived any rights to damages under the 1977 compensation plan.[11] The 1977 compensation plan was before the jury during their deliberations.

The trial judge began his instructions to the jury by explaining that the issue of liability already had been decided by this court and that the only issue to be determined by the jury was the question of damages, if any, "[t]hat is, a determination of damages due to the plaintiff, *measured by the amount of renewal commissions* Gram reasonably could have expected to receive, reduced to reflect the proportion of his time that would reasonably have been expected to have been devoted to servicing those renewal policies" (emphasis added). This language, in large part taken from this court's *Gram I* opinion, was repeatedly given verbatim. Damages should be "*measured by the amount of renewal commissions* Mr. Gram reasonably could have expected to receive"; "[t]he plaintiff had a reasonable expectancy of

---

[10] Similarly, we have stated that "[w]here the terms of a written contract are ambiguous, both parties may testify as to what they understood by the terms of the contract when they executed it. The jury will then determine what were its terms and apply the law to such facts as they find comprised its terms." *Trafton* v. *Custeau*, 338 Mass. 305, 307-308 (1959). Therefore it was appropriate for the judge to allow the jury to hear the evidence, including the terms of the 1977 agreement (even though plaintiff was not shown to have been a party to the agreement) to enable them to determine what was "reasonably anticipated."

[11] See note 5, *supra*. I agree with the court that Liberty got more than it was entitled to on this point. See note 3, *supra*, of the majority opinion.

*renewal commissions*"; "you must determine the *amount of renewal commissions* he could have reasonably expected to receive"; and "[t]he Supreme Court has said there is no dispute about Gram's right to *renewal commissions*" (emphasis added). Where the trial judge repeatedly read the language of our earlier decision in his charge to the jury, we should not say that he did not adhere scrupulously to this court's guidelines set forth in that opinion.[12]

The trial judge informed the jury that, in their role as finders of fact, it was their function to decide what components constituted "renewal commissions." "[Y]ou, as triers of fact, are to determine what is meant by compensation, and you are to determine, when we say compensation based upon his past services, what those past services constitute or constituted." Again, the judge repeated his instruction, "[a]s to what elements were included to constitute those commissions is a question of fact for you to determine." Defense counsel argued in his final argument that the jury should consider only renewal commissions. I see no basis upon which to conclude that the trial judge exceeded the scope of our instructions. I would affirm the judgment. Accordingly, I dissent.

NOLAN, J. (dissenting). I am constrained (unhappily) to file this separate dissent because the trial judge followed the teaching of *Gram I* and that is the only issue in this case. However, I cannot resist adding that my worst fears of a jury's "extravagant speculation" (*Gram I, supra* at 674-675) have materialized in the new judgment, which exceeds the first judgment by $225,000. And now for round No. 3. Iterum, pro dolor.

---

[12] Indeed, it was not necessary for the trial judge even to refer to "renewal commissions" to stay within the perimeters of our earlier guidelines, provided that he made it understood to the jury that Gram was entitled to receive only that amount that would benefit the defendant as a windfall resulting from Gram's past services.