**Wayne H. SARGENT, Plaintiff, Appellant,**

v.

**TENASKA, INC., Defendant, Appellee.**

**No. 96–1804.**

United States Court of Appeals, First Circuit.

Heard Nov. 6, 1996.

Decided March 5, 1997.

**6**

Thomas P. Billings, Boston, MA, with whom Karen S. White and Sally & Fitch were on brief for plaintiff–appellant.

Stephen B. Deutsch, Boston, MA, with whom Foley, Hoag & Eliot were on brief for defendant–appellee.

Before SELYA, Circuit Judge, ALDRICH, Senior Circuit Judge, and BOUDIN, Circuit Judge.

BOUDIN, Circuit Judge.

Wayne Sargent brought this action in the district court against his former employer, Tenaska, Inc. On appeal, the case has been narrowed: the issue is whether Sargent has a claim to certain ownership interests because of an alleged breach of the implied covenant of good faith and fair dealing under Massachusetts law. Because the district court granted summary judgment against Sargent on this issue, we review its decision *de novo*, drawing reasonable factual inferences in Sargent's favor. *Grenier v. Vermont Log Bldgs., Inc.*, 96 F.3d 559, 562 (1st Cir.1996).

Tenaska, Inc., develops power generation and cogeneration projects in different areas of the United States. Sargent, a Massachusetts resident with many years of pertinent engineering and management experience, was hired by Tenaska, Inc., in May 1990. His title was General Manager of the Eastern Region. Tenaska, Inc., had a cogeneration project under way in Lee, Massachusetts, and it was hoped that Sargent would organize other projects in the Eastern Region for the company.

Sargent's compensation included not only a management-level salary but also a promise of an "ownership interest of 1.50% in Tenaska, Inc., Lee Mass Cogeneration Company, Tenaska Gas Company and in any entities created for new projects and formed by Tenaska subsequent to [his] employment start date." This language appeared in a letter from Tenaska, Inc., to Sargent offering employment. The district court treated the letter as setting forth the initial terms of an at-will employment relationship and neither side now disputes this treatment.

Tenaska's letter provided that Sargent's ownership rights would be made available beginning twelve months after the start of his employment. The letter also said that the ownership plan, which had not yet been developed, would ultimately include a right of the company "to buy back the ownership interests of terminated employees under

specified terms and conditions that will penalize short-term employment and reward performance and long-term accomplishments."

Tenaska, Inc., never developed a single ownership plan but instead set up a separate plan for each entity, including almost a half-dozen new ones created after Sargent joined the company and during his tenure. In general, the plans provided a vesting schedule for ownership interests acquired by an employee; the company was allowed on termination of an employee to repurchase the *unvested* portion at a nominal price. The vesting schedule, in the typical plan, provided as follows: [1]

| First 6 months: | 0% is vested |
| Months 7–18: | 15% is vested |
| Months 19–30: | 35% is vested |
| Months 31–42: | 65% is vested |
| After 42nd month: | 100% is vested |

Not long after Sargent joined Tenaska, Inc., the Lee project was cancelled. The project was not revived and no other projects were secured in Sargent's region during his period of employment. In December 1993, Tenaska, Inc., decided to close its Massachusetts office and to eliminate Sargent's position. Sargent was offered a new position at the company's Omaha headquarters; the new position carried a lower salary and less favorable benefits in the ownership plans, including a reduction in various interests Sargent had or hoped to secure in existing projects.

Sargent declined the proposal and was terminated by Tenaska, Inc., in January 1994, having served about three and one-half years with the company. Prior to termination, Sargent had been granted certain ownership interests in a few of the Tenaska projects but less than all to which he deemed himself entitled under the terms of the employment letter. Sargent immediately brought the present suit in the district court against Tenaska, Inc., seeking all that his employment letter explicitly provided, and more.

The explicit contract claim need not detain us. On cross motions for summary judg-

ment, the district court ruled the employment letter was a contract, suggesting that Sargent might be entitled to ownership interests, or comparable damages, to the extent that the promised interests had become vested under their plans at the time of his termination. *Sargent v. Tenaska, Inc.,* 914 F.Supp. 722, 729, 730 (D.Mass.1996). Thereafter, Sargent and Tenaska, Inc., reached a settlement that disposed entirely of these express contract claims.

What remains open is Sargent's claim for "more." In substance, Sargent has argued in the district court and on appeal that he is also entitled to the unvested portion of the ownership interests in question that would have become vested in due course if he had not been discharged. The basis for this claim is the implied covenant of good faith and fair dealing that Massachusetts law reads into employment contracts.

This implied covenant has been taken by Massachusetts courts to permit discharged employees to recover unpaid commissions or other expectancies in certain circumstances. *Fortune v. National Cash Register Co.,* 373 Mass. 96, 364 N.E.2d 1251, 1257–58 (1977). One condition is that the discharge have been done in bad faith; another, put generally, is that the interest or claim pertains to "past" services, *i.e.,* to services already performed at the time of the discharge. *McCone v. New England Tel. & Tel. Co.,* 393 Mass. 231, 471 N.E.2d 47, 49–50 (1984).

In the district court Tenaska, Inc., sought summary judgment against this *Fortune* claim. It conceded that its good or bad faith in discharging Sargent could not be determined on summary judgment, but asserted that the unvested interests claimed by Sargent were compensation for future rather than past services. The district court agreed, stressing the language in the employment letter that the vesting provision was designed to "reward performance and long-term accomplishments." This appeal followed.

---

1. In the case of one company, the entire interest could be repurchased even after the full vesting period, but Tenaska had to pay book value for the vested portion. For another company, half the vested interest could always be repurchased for nominal value. These variations do not alter the issue on appeal, and we disregard them for simplicity's sake.

The *Fortune* doctrine is easy to grasp in the simple case that spawned it: an at-will salesman, entitled to a commission payable at a later date, is fired, after the sale but before the date of payment; and the reason for the firing is to cut off the commission. In that case, Massachusetts courts imply a covenant of good faith and fair dealing, treat the discharge as a breach, and fix the remedy as an award to the salesman of future compensation for the completed sale. *Fortune*, 364 N.E.2d at 1257–58.

Since *Fortune* so held in 1977, Massachusetts appeals courts have both extended and limited the doctrine in several important decisions. For example, *Fortune*-based recoveries have been allowed in *Gram v. Liberty Mut. Ins. Co.*, 384 Mass. 659, 429 N.E.2d 21, 29 (1981) ("*Gram I* "), *Maddaloni v. Western Mass. Bus Lines*, 386 Mass. 877, 438 N.E.2d 351, 355–56 (1982), and *Cataldo v. Zuckerman*, 20 Mass.App.Ct. 731, 482 N.E.2d 849, 855–56 (1985). These cases make clear that *Fortune* is not limited to simple cases of commission sales with deferred payments. *Id.*, 482 N.E.2d at 851–52.

On the other hand, the Supreme Judicial Court has confined recovery to "identifiable, future benefit[s] ... reflective of past services," *Gram I*, 429 N.E.2d at 29, and firmly excluded prospective benefits not thus tied to past services, *McCone*, 471 N.E.2d at 50; *Gram v. Liberty Mut. Ins. Co.*, 391 Mass. 333, 461 N.E.2d 796, 798 (1984) ("*Gram II* "). The recurring difficulty, presented in the case before us, is how to decide whether the unvested interests relate to "past" or "future" services.

We treat this characterization issue as one of law. The contract terms agreed to by the parties are not in dispute; the debate is whether the law should extend protection (assuming bad faith discharge) beyond the express terms of the contract to certain expectancies. The extent of such protection is primarily a matter for judges, not juries. *See Gram II*, 461 N.E.2d at 798; *cf. Green v. Richmond*, 369 Mass. 47, 337 N.E.2d 691, 695 (1975) (judge decides the legal question of whether undisputed contract terms violate public policy).

It is easy to find a protectable interest where, as in *Fortune*, the promised future payment is directly tied to a particular past service, such as a discrete sale. This kind of correlation is harder where the future payment is connected not with a specific past act but with continued service at the company over a period of time. The company could be interested simply in the employee's service as it occurs or, at the other extreme, in keeping the employee until the last day no matter what. In the former case, one could treat all of the time worked *prior* to discharge as *past* services and require pro rata payment; the latter case might suggest otherwise.

In reality, motives are often mixed: the company may want both to provide an ongoing incentive to work harder and to retain an ever more valuable employee as long as possible. A periodic vesting schedule achieves both aims; and the latter is reenforced where, as here, the *incremental* amount vested in each period increases in later periods. And, with periodic vesting, the employee gets some contractual protection (*i.e.*, of vested interests) against the loss of the job in midstream.

A good argument could be made that, where a colorable periodic vesting period is provided, the parties should be taken to have settled between themselves the issue that the *Fortune* doctrine itself seeks to mediate: how much of the promised future compensation should be treated as already earned prior to the discharge. But Massachusetts case law sends mixed signals on this issue. *Compare Cataldo*, 482 N.E.2d at 851–52, *with Cort v. Bristol–Myers Co.*, 385 Mass. 300, 431 N.E.2d 908, 910–11 (1982).

Certainly, terms like "vested" and "unvested" do not automatically control. An agreement might provide that an employee who worked for five years to complete a five-year project would get a one-third interest at the end but nothing if he left prior to that date. If the employee was fired in bad faith a month before completion, it is doubtful that

*Fortune* could be shrugged off by saying that the interest had not yet vested.[2]

Still, ordinarily, a colorable *periodic* vesting schedule crudely delineates the line between past and future services. While Sargent remained at the company, his past services grew; but so did his vested interests. Most of his past services were therefore already compensated by his contractual claims to vested interests; and unvested interests were largely associated with future services not protected under *Fortune.* We say "largely" because *within* the single vesting period embracing the date of discharge, one could make an effort to distinguish and protect services already performed between the start of that period and the date of discharge.

Sargent has made no effort to argue for or support such a drastic narrowing of his claim; he has chosen to argue that yet unvested interests from *all* then-occurring and future vesting periods are related to past compensation. Taking the case as he has framed it, we agree with the district court: taken as a whole, the unvested interests claimed by Sargent did not specifically and identifiably correspond to Sargent's past services. Predominantly, they were oriented to compensating services not yet provided.

Sargent himself is unable to explain how the unvested interests he claims can plausibly be treated as payment for past services. His main argument is that it would be "an odd sort of 'future compensation' indeed, when the employee pays for it, receives it, earns income on it, and pays taxes on it—all in the present." But there is nothing odd about it; certainly future services can be conditionally purchased by a nominal transfer of ownership subject to a vesting provision and enforced by a buy-back option.

Sargent's best argument hangs on a single precedent, the Massachusetts Appeals Court decision *Cataldo.* There, a developer hired Cataldo to supervise its projects, promising him, in addition to a base salary, a portion of the developer's equity in two named projects and in future projects handled by the firm. If Cataldo's employment ended during a project, the firm could buy back his interest at the *lesser* of appraised value or a sliding scale payment, giving Cataldo $1,000 per month times the number of months the project had consumed. *Cataldo,* 482 N.E.2d at 851–52.

The latter provision was effectively a periodic vesting provision. When Cataldo was later fired, he sued for his share of the developer's equity in several uncompleted projects. Although the trial judge apparently thought the express contract claim more suitable, he also instructed the jury under *Fortune* doctrine. *Cataldo,* 482 N.E.2d at 854. The jury awarded Cataldo substantial sums. The Appeals Court affirmed, saying:

> We conclude that, when Cataldo was discharged, the possibility that Cataldo would gain later a vested share of the developer's equity in each [firm] project then viable was sufficiently an 'identifiable, future benefit … reflective of past services' … performed by Cataldo, to come within the principle of the *Fortune* case. We recognize, of course, that the precise limits of the doctrine of that case are not free from doubt.

*Cataldo,* 482 N.E.2d at 855–56 (citations omitted).

Yet the Appeals Court never decided the question—critical to us—whether the buy-back provision limited the firm's liability to Cataldo with respect to uncompleted projects. Instead, the court upheld a jury finding that the buy-back option had been waived because the firm failed to exercise that option promptly. *Cataldo,* 482 N.E.2d at 857. Indeed, the court's language implies that it might otherwise have limited liability to the vested interests. *Hammond v. T.J. Litle & Co.,* 82 F.3d 1166, 1168–69, 1172 (1st Cir.

---

**2.** We decline Sargent's invitation to rely upon the unpublished slip opinion in *Ground Round, Inc. v. King,* 41 Mass.App.Ct. 1110, 671 N.E.2d 224 (1996) (Table), a summarily affirmed decision of the Massachusetts Appeals Court that has some bearing upon such a hypothetical. Massachusetts forbids citations to such opinions in most circumstances, *see Lyons v. Labor Relations Comm'n,* 19 Mass.App.Ct. 562, 476 N.E.2d 243, 246 n. 7 (1985), for reasons explained by the *Lyons* court, *id.,* that make the seldom employed alternative practice exemplified by *Aviles v. Burgos,* 783 F.2d 270, 283 n. 4 (1st Cir.1986), inapposite here.

1996), perhaps closer to our own facts, turned on the plain error rule.

Absent controlling precedent, we have sought to apply the principle of *Fortune*—protection of compensation earned for *past* services—and conclude that it does not fit Sargent's unvested interests. To repeat, this is not because of any magic in the terms vested and unvested, but because the unvested interests here predominantly concern *future* services expected from Sargent. *Gram II*, 461 N.E.2d at 798. If *Fortune* is to be extended, this is a matter for the Massachusetts courts and not for us.

*Affirmed.*