NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

23-P-388                                        Appeals Court

CUTTING EDGE HOMES, INC.  vs.  ALAN J. MAYER.


No. 23-P-388.

Norfolk.      November 6, 2023. - February 27, 2024.

Present:  Ditkoff, Englander, & Walsh, JJ.


Contract, Interference with contractual relations.  Unlawful
    Interference.  Practice, Civil, Summary judgment.



    Civil action commenced in the Superior Court Department on
March 4, 2020.

    The case was heard by Joseph F. Leighton, Jr., J., on a
motion for summary judgment.


    James W. Simpson, Jr., for the plaintiff.
    Jon C. Cowen for the defendant.


    ENGLANDER, J.  The plaintiff, Cutting Edge Homes, Inc.

(Cutting Edge) appeals from a summary judgment dismissing its

claim for intentional interference with contractual or

advantageous business relations against the defendant, Alan J.

Mayer.[1]  The case requires us to consider the element that the defendant (Mayer) must have acted with "improper motive or means," Psy-Ed Corp. v. Klein, 459 Mass. 697, 716 (2011); United Truck Leasing Corp. v. Geltman, 406 Mass. 811, 816-817 (1990), in the context where Mayer was hired by one party to a contract to advise regarding the performance of the other contracting party.  Here, Cutting Edge, a general contractor, contracted with residential homeowners, Rory and Sharon Shapiro, to perform a multimillion-dollar renovation of their home.  The Shapiros retained Mayer to perform architectural services, including reviewing Cutting Edge's work and Cutting Edge's invoices.  Mayer regularly criticized Cutting Edge's invoices, among other things stating to the Shapiros that they were being "overbilled" by hundreds of thousands of dollars.  Eventually, the Shapiros terminated their contract and relationship with Cutting Edge before the project was complete, and finished the project using a different contractor suggested by Mayer.

At summary judgment, the central question was whether Cutting Edge had presented sufficient evidence to support a genuine issue of material fact that Mayer's conduct was

_____

[1] The complaint also named Rony Shapiro and Sharon Shapiro, individually and as trustees of the Roney G. Shapiro 2006 Revocable Trust U/D/T May 22, 2006 (collectively the Shapiros), but the plaintiff and the Shapiros settled their dispute and the Shapiros were dismissed with prejudice.  The Shapiros are not parties to this appeal.

"improper in motive or means."  The judge ruled that the evidence was not sufficient; he concluded that there was no evidence that Mayer acted with improper motive, and with respect to improper means, "at most, . . . Mayer carried out his review of the [i]nvoices and conveyed his findings to the Shapiros negligently."  We agree that negligent (or even grossly negligent) conduct in this context is insufficient to meet the "improper means" element; rather, the plaintiff is required to show conduct amounting to deceit or dishonesty.  See Cavicchi v. Koski, 67 Mass. App. Ct. 654, 658 (2006); Restatement (Second) of Torts § 772 (1979).[2]  Here, after reviewing the summary judgment record, we agree that Cutting Edge failed to adduce evidence that could support a finding of deceit or dishonesty, and we accordingly affirm.

Background.[3]  The Shapiros engaged Cutting Edge in the spring of 2018, and entered into a "Service Agreement" dated April 27, 2018 (service agreement).  The scope of the project included, among other things, rebuilding one half of the Shapiros' residence, replacing the heating, plumbing, and air conditioning systems, and repairing the roof and the exterior of

---

[2] All references to the Restatement are to the Restatement (Second) of Torts (1979).

[3] We review the facts in the summary judgment record in the light most favorable to the non-moving party, Cutting Edge.  See DeWolfe v. Hingham Centre, Ltd., 464 Mass. 795, 799 (2013).

the home.  The total initial contract price was $2,150,000 (it was thereafter substantially increased, as was the scope of work), to be paid in a series of installments.  Under the service agreement, Cutting Edge was to provide the Shapiros with an account summary every thirty days, indicating the amount budgeted for and actual cost of specific aspects of the project. Cutting Edge was to begin its work on May 1, 2018 and substantially complete the same by December 31, 2018.  In fact, Cutting Edge continued to work on the project until October 2019, when the Shapiros terminated the relationship.

At or near the inception of the project, the Shapiros informed Cutting Edge that it must collaborate with Mayer, an architect whom the Shapiros had hired to provide architectural, interior design, and administration services.  Importantly, the Shapiros requested that Mayer review the invoices provided by Cutting Edge.  Cutting Edge began submitting itemized invoices to the Shapiros in late 2018.  The invoices included a spreadsheet that tracked progress, costs, and modifications to the project.  Mayer began reviewing those invoices in December 2018, and after analyzing the first invoice, Mayer concluded that Cutting Edge had overbilled the Shapiros by approximately $250,000.  As of the time Mayer began reviewing invoices he had not reviewed the service agreement, and it is inferable that Mayer's conclusion was influenced, at least in part, by his view

that the Shapiros should be paying Cutting Edge based upon a percentage of work completed to date, and invoicing using a form used by the American Institute of Architects. In fact, the service agreement provided for payment based on a set schedule of monthly payments rather than a percentage of work completed.

Mayer reached similar conclusions regarding overbilling after analyzing each subsequent invoice, and he discussed his conclusions with the Shapiros, providing his own comments and conclusions in the margins of Cutting Edge's spreadsheets. The Shapiros discussed the alleged overbilling with Sean Cutting, the president of Cutting Edge, on several occasions. Despite Mayer's advice, the Shapiros continued to pay Cutting Edge the amounts Cutting Edge invoiced until at least August 2019. The Shapiros stated that they did so because they wished to have the project completed as soon as possible.

Mayer also regularly communicated with Cutting Edge. In July 2019, Mayer addressed his concerns regarding overbilling with Cutting Edge directly; at that time Cutting Edge agreed to update the invoices to reflect Mayer's desired format. Mayer nevertheless continued to disagree with Cutting Edge's estimate of the percentage of work completed, and repeatedly asked Cutting Edge to provide "backup" documentation detailing expenses and work completed on specific line items. Similar disagreements between Mayer and Cutting Edge continued until

October 2019.  In e-mails Mayer sent to Rory Shapiro in October 2019, Mayer commented that "[Cutting Edge]'s invoice is $680,000 more than what they currently are due," that as to certain entries Cutting Edge was "just making this stuff up and [it] has done [so] for every previous invoice," and that Mayer believed "that [was] sufficient grounds for dismissal."

On October 25, 2019 the Shapiros, through counsel, sent Cutting Edge a "Notice of Termination of Service Agreement." The notice cited several reasons for the termination, the very first of which stated:  "[Cutting Edge] routinely overbilled [the Shapiros] based on the claimed completion of work that was not done or even properly invoiced."  After terminating Cutting Edge and on Mayer's recommendation, the Shapiros engaged a different contractor to complete work on the remodeling project. Mayer did not review any of the new contractor's invoices.

In March of 2020 Cutting Edge brought suit in Superior Court, alleging intentional interference with advantageous business relations on the part of Mayer.[4]  After discovery, a Superior Court judge entered summary judgment for Mayer, reasoning that Cutting Edge had not adduced sufficient evidence of either improper means or causation.  This appeal followed.

---

[4] Cutting Edge also brought a G. L. c. 93A claim against Mayer, which was dismissed by stipulation in October 2022.

Discussion. "We review a grant of summary judgment de novo." Blake v. Hometown Am. Communities, Inc., 486 Mass. 268, 272 (2020), quoting DeWolfe v. Hingham Centre, Ltd., 464 Mass. 795, 799 (2013). To survive summary judgment on its claim of intentional interference with contractual relations, Cutting Edge needed to adduce sufficient evidence to meet four elements: (1) it had a contract (or prospective business relations) with the Shapiros, (2) Mayer knowingly induced the Shapiros to break the contract (or prospective business relations), (3) Mayer's interference was improper in motive or means, and (4) Cutting Edge was harmed by the interference (causation and damages). See Psy-Ed Corp., 459 Mass. at 715-716.[5]

Here, it is undisputed that Cutting Edge and the Shapiros were parties to a contract, that Mayer knew of the contract, that Mayer acted intentionally in providing his advice with respect to that contract, and that the Shapiros terminated their relationship with Cutting Edge. The next question is whether

---

[5] Mayer's conduct could be framed both as interfering with Cutting Edge's existing contract, and as interfering with prospective business relations given that the scope of Cutting Edge's work for the Shapiros regularly expanded. See Chemawa Country Golf, Inc. v. Wnuk, 9 Mass. App. Ct. 506, 509-510 (1980), quoting Restatement (Second) of Torts § 766B comment c (describing the "recognized extension" of "field of potential harm [to] 'any other relations leading to potentially profitable contracts'"). The elements of the two claims are not materially different for present purposes, so the distinction does not matter to our analysis.

Mayer's actions could be found to be "improper in motive or means." This element of a tortious interference with contractual relations claim -- that is, that the conduct must be "improper" -- has proved difficult to capture in a universal standard. The element is critical because it is not enough to show that the defendant intentionally advised a party to breach or forego a contract;[6] rather, the defendant must have acted improperly, with "improper" generally meaning "innately wrongful, [and] predatory in character," Restatement (Second) of Torts § 766B comment (d), deceitful, or involving "threats, misrepresentation, or defamation." Cavicchi, 67 Mass. App. Ct. at 658. See also Williamson v. Barlam, 103 Mass. App. Ct. 727, 733-735 (2024).

As we discussed in Cavicchi, supra at 660-661 & n.10, the Restatement (Second) of Torts addresses the "improper" element at length, and dedicates an entire section to the circumstances at issue here, where a defendant was specifically asked to advise a contracting party regarding its contractual relationship. Section 772 of the Restatement states:

> "One who intentionally causes a third person not to perform a contract or not to enter into a prospective

---

[6] We note that the element of intent -- what the Psy-Ed case defines as "knowingly induce" -- is a separate element from the "improper" element. Psy-Ed, 459 Mass. at 715. The intent element is satisfied here, where Mayer knew that his review of Cutting Edge's billing and performance might lead the Shapiros to terminate the contract.

contractual relation with another does not interfere improperly with the other's contractual relation, by giving the third person

(a) truthful information, or

(b) honest advice within the scope of a request for the advice."

In its "comment[s]," the Restatement elaborates on what it means by "honest" advice: "It is sufficient for the application of this rule that the actor gave honest advice within the scope of the request made. Whether the advice was based on reasonable grounds and whether the actor exercised reasonable diligence in ascertaining the facts are questions important only in determining his good or bad faith. But no more than good faith is required." Restatement (Second) of Torts § 772 comment e. Further, as another comment notes, "[t]he rule as to honest advice applies to protect the public and private interests in freedom of communication and friendly intercourse. In some instances the rule protects the public and private interests in certain professions or businesses. Thus the lawyer, the doctor, the clergyman, the banker, the investment, marriage or other counselor, and the efficiency expert need this protection for the performance of their tasks." Restatement (Second) of Torts § 772 comment c.

In Cavicchi, 67 Mass. App. Ct. 655-656, the plaintiff and the defendant were both attorneys, who had shared a common

client.  The plaintiff alleged that the defendant tortiously interfered with the plaintiff's relationship with the client by misrepresenting to the client facts regarding the plaintiff's professional competence.  Id. at 658-659.  This court ruled that a portion of the plaintiff's tortious interference claim could proceed, in the process citing and quoting with approval from the Restatement § 772.  Calvicchi, supra at 660.

Cavicchi involved allegations that amounted to deceit -- that is, intentional misrepresentations that were intended to, and did, cause the receiving party to rely on them.  Id. at 658. The facts of Cavicchi thus do not answer the question of what actions, short of deceit, can nevertheless qualify as "improper" for purposes of a tortious interference claim.  The court's citation to § 772, however, is instructive.  It is not sufficient to show that the advisor was negligent, or made negligent or even grossly negligent misrepresentations.  What is required is at least a showing of dishonesty, which the Restatement equates with a lack of good faith.  See Restatement (Second) of Torts § 772 comment e.  As the Restatement comments explain, this heightened standard for liability is appropriate to "protect the public and private interests in freedom of communication" -- in recognition that contracting parties seek and receive advice regarding their contractual relationships constantly.  Restatement (Second) of Torts § 772 comment c.

The rationale underlying § 772's heightened burden is analogous to (although not as stringent as) the requirement adopted by our courts for tortious interference claims in the employment context -- there the plaintiff must show that the employer acted with "actual malice."  See Blackstone v. Cashman, 448 Mass. 255, 270 (2007) (defining "actual malice" in the employment context as "spiteful, malignant purpose unrelated to a legitimate corporate interest").  This requirement "provides a measure of protection to corporate supervisors, who must necessarily make adverse employment decisions from time to time and who otherwise would be unduly exposed to the tortious interference claims of disgruntled former employees."  Kelleher v. Lowell Gen. Hosp., 98 Mass. App. Ct. 49, 54-55 (2020), citing Alba v. Sampson, 44 Mass. App. Ct. 311, 315 (1998).  See also Gram v. Liberty Mut. Ins. Co., 384 Mass. 659, 663-664 (1981), S.C., 391 Mass. 333 (1984).

Here, we agree with the Superior Court judge that the evidence fell short of generating a genuine issue of fact as to Mayer's improper motive or means.[7]  To show an improper motive,

_____

[7] As a second ground for summary judgment, the judge ruled that Cutting Edge failed to adduce sufficient evidence of causation -- that is, that Cutting Edge did not show that Mayer's communications caused the Shapiros to terminate Cutting Edge.  We disagree with the judge's conclusion as to this issue. In particular, the very first ground listed in the termination notice itself was "routine[] overbill[ing] [of the] [o]wner based on the claimed completion of work that was not done or

what is required is a showing of an intent specifically to harm the plaintiff, unrelated to any legitimate business purpose. See Cavicci, 67 Mass. App. Ct. at 658 (improper motive "'may include ulterior motive [e.g., wishing to do injury],'" as well as "evidence of retaliation or ill will" [citations omitted]). Here, there is no evidence of Mayer harboring an improper motive, and Cutting Edge does not so argue.[8]

We also agree that there was insufficient evidence of improper means. It is true that the evidence, viewed in the light most favorable to Cutting Edge, shows that Mayer initially failed to heed the payment provisions of the service agreement between Cutting Edge and the Shapiros, and that this failure gave rise (at least in part) to criticism of Cutting Edge and to an ongoing disagreement between Mayer and Cutting Edge over amounts invoiced. The evidence also shows that Mayer made

---

even properly invoiced." A fact finder would not be required to credit Sharon Shapiro's deposition testimony that this was not a cause of the termination, especially where Rory Shapiro's deposition testimony suggested that Mayer's input contributed to the decision to fire Cutting Edge. On this record, a reasonable jury could certainly find that Mayer's communications caused the termination. For the reasons discussed in this opinion, however, Cutting Edge's claim fails over the improper means or motive element.

[8] The formulation of "improper in motive or means" in our case law differs slightly from the Restatement, which states only that the interference must be "improper." Restatement (Second) of Torts § 766. It is not clear from our cases how important an improper motive is, if it is not accompanied by improper conduct.

mistakes from time to time in his reviews and calculations. But what the evidence does not show is conduct amounting to deceit or intentional misrepresentation; nor does it show dishonesty.

As indicated, Mayer was specifically hired by the Shapiros to review Cutting Edge's spreadsheets and to provide his advice. While Mayer was critical of Cutting Edge's billing practices in e-mails to the Shapiros, the record does not support an inference that Mayer communicated his concerns to the Shapiros for a reason other than to fulfill his professional obligation consistent with the Shapiros' wishes. Indeed, a review of the e-mail correspondence between Mayer, Cutting Edge, and the Shapiros shows that Mayer repeatedly consulted with Cutting Edge regarding the discrepancies he observed between the amounts invoiced and the work completed, and that he sought to clear up points of confusion. In a July 2019 e-mail to Cutting Edge, for example, Mayer explained his modifications to one of Cutting Edge's spreadsheets and noted that despite his confusion over discrepancies, he was "sure that there [were] some areas where the [completion percentage] may be off, or where [Cutting Edge] [had] backup for additional deposits that [had] been paid to date." In short, the parties' communications reflect honest disagreement and efforts to work through issues, not bad faith.

In sum, Cutting Edge at most has pointed to statements, communications, and actions by Mayer that a jury could

reasonably find were negligent (or perhaps even grossly negligent).  That evidence falls short of the legal standard for improper means, and thus fails to demonstrate the existence of a genuine issue of material fact.[9]  The Superior Court judge's grant of summary judgment for Mayer is affirmed.

<u>So ordered</u>.

---

[9] It is true that notwithstanding his efforts to work with Cutting Edge, Mayer was skeptical of Cutting Edge's invoicing and made his suspicions known to the Shapiros in multiple communications.  For example, in an October 2019 e-mail concerning an alleged $35,000 overpayment for an elevator, Mayer characterized Cutting Edge's billing practices as "creative invoicing" and their requisitions as "accounting creations."  While such commentary certainly speaks of Mayer's frustrations with Cutting Edge, when taken in the context of months of communications showing a back and forth over amounts billed, no reasonable fact finder could conclude that such rhetoric amounted to intentional misrepresentation or dishonesty.